Day-Bergwall Co. v. State, 190 Wis. 8.

DAY-BERGWALL COMPANY, Plaintiff in error, vs. THE STATE, Defendant in error.

*February 12—May 11, 1926.*

*Food: Flavoring preparation colored to imitate vanilla extract: Pure food laws: Definiteness: Conscious imitation of article of food: Preparation truthfully labeled but lending itself to fraud: Police power of legislature: Classification of foods: Reasonableness: Federal pure food act.*

1. In a prosecution for the violation of secs. 4600 and 4601, Stats. 1923, by the manufacturer of a flavoring preparation so colored as to imitate vanilla extract and intended for the same uses as that extract, and the prepared article lending itself readily to the perpetration of a fraud on the retail trade, the evidence is *held* to sustain a conviction, although the product was properly and truthfully labeled.   p. 14.

2. The pure food law of this state was designed for the protection of the public from fraud as well as for the protection of the public health.   p. 14.

3. A criminal statute should be so definite and certain that a defendant can know absolutely in advance whether a certain act will constitute a violation of the law.   p. 18.

4. Pure food statutes generally create offenses which are *malum prohibitum* and not *malum in se,* and should therefore be reasonably definite, and should not require a defendant to enter into the realm of speculation to determine whether he is committing an offense.   p. 18.

5. Imitation of the color of another substance in violation of sub. (2), sec. 4601, Stats. 1923, must be a conscious imitation; and whether such consciousness exists is in most cases an issue of fact.   p. 19.

6. The pure food law, although not definitely naming the various substances which cannot be imitated, is not void because it is too general and indefinite.   p. 19.

7. The legislature, in passing pure food laws to protect the public
   . from the perpetration of fraud, in the exercise of its
   prerogative is supreme, and its statutes cannot be annulled
   by the court without a usurpation of legislative power. p. 21.
8. The pure food laws classifying foods which shall be deemed
   adulterated under certain conditions are *held* not arbitrary
   and unreasonable.  p. 23.
9. The courts are only warranted in declaring a law unconstitu-
   tional for improper classification when it exceeds the bounds
   of reasonableness and propriety beyond a reasonable doubt;
   and whether the classification is the best which could be
   made or invulnerable from criticism is for the legislature
   and not for the court.  p. 23.
10. The imitation of another substance so as to lend itself to the
    perpetration of fraud may be an offense notwithstanding the
    product is truthfully labeled and contains no harmful or
    deleterious substances.  p. 24.
11. The federal pure food law, which prohibits the transportation
    of adulterated foods in interstate commerce, does not cover
    the same field as the state pure food law (secs. 4600 and
    4601, Stats. 1923), which is a valid regulation of commerce
    in foodstuffs within the state.  p. 27.

ERROR to review a judgment of the municipal court of
Milwaukee county: E. T. FAIRCHILD, Acting Judge.  *Af-
firmed in part; reversed in part.*

The plaintiff in error, hereinafter called the defendant,
was charged in an information on two counts with viola-
tions of the pure food laws of the state, and upon a trial by
the court without a jury was found guilty and sentenced to
pay a fine.   In the first count the defendant was charged
with having sold an article of food which· was adulterated
by being colored in imitation of the genuine color of another
substance, as defined in the sixth specification of sub. (2)
of sec. 4601 of the Statutes.  We will not set forth the charge
contained in the second count of the information for the
reason that the State has abandoned this charge and re-
quests a reversal of the judgment and sentence thereon.

"Van-Cu-Co" is the trade name of a compound manu-
factured and sold by the defendant.   The article contains

the following ingredients: Vanillin, coumarin, alcohol, sugar, water, and caramel color. It is conceded that the constituent ingredients are not injurious to the public health; that the compound is used in flavoring foods and confections. The principal basis of the compound consists of vanillin and coumarin, the true vanillin being extracted from the vanilla bean, while the true coumarin is extracted from the tonka bean. The quantity of true vanillin and coumarin is so limited as to prevent its use as a flavoring extract in the preparation of foods, and therefore the trade has succeeded in manufacturing these ingredients synthetically, and it is the synthetic article which is ordinarily used by the trade in the manufacture of flavoring extracts and compounds, and when so used is non-deleterious to the health, and is fully as effective as the true product.

The compound Van-Cu-Co, without the addition of a coloring matter, is as transparent as water, and when caramel is added it assumes a brownish color, similar to if not identical with that of vanilla extract. While the first count in the information charges a violation of the statute to the effect that the compound complained of was colored in imitation of the genuine color of other substances, viz. vanilla extract, tonka extract, and a mixture of vanilla extract and tonka extract, the evidence in the case shows that the coloring was designed as an imitation solely of vanilla extract. It also appears that the substance known as caramel is nothing more or less than burnt sugar; that the quantity of caramel used is regulated in accordance with what may be necessary to color the compound like vanilla extract; that a gallon of vanilla extract costs about $9, while a gallon of Van-Cu-Co costs about $1.40; that the cost of a one-ounce bottle of Van-Cu-Co at retail is about ten cents, and that a similar quantity of vanilla costs about twenty cents. The agents of the food department on numerous

Day-Bergwall Co. v. State, 190 Wis. 8.

occasions, in purchasing vanilla extract, were given Van-Cu-Co by the dealers.

Further facts will be referred to in the opinion.

For the plaintiff in error there were briefs by *Schmitz, Wild & Gross* of Milwaukee, and oral argument by *Edwin J. Gross.*

For the defendant in error there was a brief by the *Attorney General, J. E. Messerschmidt,* assistant attorney general, *Eugene Wengert,* district attorney of Milwaukee county, *George B. Skogmo,* special assistant district attorney, and *C. Stanley Perry,* assistant district attorney; and the cause was argued orally by *Mr. Messerschmidt.*

The following opinion was filed March 9, 1926:

DOERFLER, J.   The statutes involved are the following: Sec. 4600 provides:

"Any person who shall . . . sell, exchange, deliver or have in his possession, with intent to sell, exchange, offer for sale or exchange any drug or article of food which is adulterated, . . . shall be fined not less than twenty-five dollars, nor more than one hundred dollars, or be imprisoned in the county jail not less than thirty days nor more than four months. . . . The term 'food,' as used herein shall include all articles used for food or drink or condiment by man, whether simple, mixed or compound, and all articles used or intended for use as ingredients in the composition thereof or in the preparation thereof."

Sec. 4601.   "An article shall be deemed to be adulterated within the meaning of the preceding section:

"(1) . . .

"(2) In the case of food: *First,* if any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its strength, quality or purity; *second,* if any inferior or cheaper substance or substances have been substituted wholly or in part for it; *third,* if any valuable or necessary ingredient has been wholly or in part

abstracted from it, or if it is below that standard of quality, strength or purity represented to the purchaser or consumer; *fourth,* if it is an imitation of, or sold or offered or exposed for sale under the name of another article; *fifth,* if it consists of or is manufactured, wholly or in part, from a diseased, contaminated, filthy, decomposed, tainted or rotten animal or vegetable substance or any animal or vegetable substance produced, stored, transported, or kept in a condition that tends to render the article diseased, contaminated or unwholesome, or if it is any part of the product of a diseased animal, or the product of an animal that has died otherwise than by slaughter; *sixth,* if it is mixed, colored, coated, polished, powdered or stained, whereby damage or inferiority is concealed, or so that it tends to deceive or mislead the purchaser or consumer, or if by any means it is made to appear better or of greater value than it really is, *or if it is colored or* flavored *in imitation of the genuine color* or flavor *of another substance; seventh,* if it contains any added substance or ingredient which is poisonous, injurious or deleterious to health, or any deleterious substance not a necessary ingredient in its manufacture; provided, that any article of food which is not adulterated under the provisions of the fourth, fifth, sixth and seventh specifications of this section, and which does not contain any filler or ingredient which debases without adding food value, shall not be deemed adulterated in the case of mixtures or compounds sold under their own distinct names or under coined names, if the same be so labeled, branded or tagged as plainly to show their true character and composition. . . ."

The State contends that Van-Cu-Co is colored in imitation of the genuine color of another substance, viz. vanilla extract. The defendant denies this, and takes the position that the caramel is added not for the purpose of producing a coloring similar to and in imitation of such extract, but to add to the compound a valuable and additional flavor or bouquet, viz. that of caramel.

Van-Cu-Co is sold in bottles contained in cartons, which are properly labeled as follows: "Net contents 1¼ fluid ozs. VAN-CU-CO. A compound composed of artificial

vanillin and coumarin, sugar, water, and alcohol. Colored with caramel color. Manufactured by Day-Bergwall Co., Milwaukee." These labels, so displayed, are neither deceptive nor misleading, for they contain a true statement of all of the ingredients that are used in the manufacture of the compound. Without the addition of the caramel the product would assume the color of water and be transparent, and such product so manufactured and sold would not constitute a violation of the statutes in question; and the only objectionable feature contained in the composition, and complained of, consists in the addition of the caramel in such quantities as will produce a coloring which is either identical or similar to that of vanilla extract.

The evidence in the case satisfactorily discloses that the addition of the caramel which produces the color of vanilla extract adds much to the salability of the product. From tests actually made, it is clearly apparent that the added caramel does not as a matter of fact produce any substantially new flavor or bouquet; on the contrary, the taste of the compound with or without the addition of caramel is substantially alike. One Klueter, chief chemist in the office of the Dairy and Food Department, testified in substance as follows: "All I know of or have been able to find is that the caramel adds nothing to the product excepting coloring. I could detect no perceptible difference in the taste of the colored and uncolored Van-Cu-Co. My best judgment is that in the use of either the colored or uncolored Van-Cu-Co for flavoring purposes in the preparation of food, no perceptible difference in the taste of the product is produced." Mr. Kramer, the senior food inspector in the Dairy and Food Department, substantially corroborated the foregoing testimony of Mr. Klueter. One Anderson, the manufacturing chemist for the defendant, testified in its behalf that in the food products where Van-Cu-Co is used, the taste of caramel is not materially perceptible. Mr. Berg-

wall, the president of the defendant, testified that in his business he sells both pure vanilla extract and Van-Cu-Co; that he does not sell Van-Cu-Co uncolored in the trade; that the uncolored Van-Cu-Co could not be sold as advantageously as the colored; that the trade would not accept it as readily, and that the product is colored like vanilla extract so as to effect a more ready sale; that in adding an additional amount of caramel to that ordinarily used, the product would be made too dark.

There is therefore ample evidence in the case to support the judgment of the lower court.  Both vanilla extract and Van-Cu-Co are sold to consumers for the sole purpose of adding flavor to food.  Vanilla extract, as is well known, has been used for many years in the preparation of foods, and it serves the purpose of adding a delicious flavor.  Its principal ingredient is vanillin, and although the latter is synthetically prepared it is of equal quality, and serves fully the same purpose as the true product derived from the vanilla bean.  A gallon of vanilla in the market costs about seven times as much as a gallon of Van-Cu-Co, and it is sold at retail at a much higher price.  Van-Cu-Co as one of its principal ingredients contains vanillin, which is also the principal element in vanilla extract.  Therefore, it clearly appears that the product known as Van-Cu-Co, colored as it is to imitate vanilla extract, lends itself readily to the perpetration of fraud in the retail trade, and the pure food law of the state was not only enacted and designed for the protection of the public health but for the protection of the public from fraud.

Defendant's counsel place great reliance upon *Comm. v. New England M. S. Co.* 217 Mass. 432, 105 N. E. 453, and *Adams v. New England M. S. Co.* 210 Mass. 475, 97 N. E. 85.  In the former case defendant was charged with the sale of a syrup under the trade name of "Golden Tree Syrup," the same being adulterated and in violation of a

statute which, among other things, defined adulteration "if the article sold is in imitation of, or is sold under the name of another article." The syrup as sold was properly labeled, and the court held that, being so labeled, no attempt to deceive or defraud could be inferred on that ground. It further held that: "The mere facts that the consistency of the two syrups was the same, and that the color of the compound was the same as one of the various colors of pure maple syrup, are not enough."

A comparison of the Wisconsin and the Massachusetts statutes upon the subject involved will disclose that there exists a material difference between the same. Under the Massachusetts statutes, an adulteration results if the compound is an imitation of another article. This language, therefore, is general in its nature, and includes not only an imitation by coloring but by consistency and other qualities, and therefore the court held that the mere similarity of consistency and color of the two products was not sufficient to amount to a violation of the statute. In sharp contrast to the Massachusetts statute, the Wisconsin statute is definite and specific, for it confines the imitation to a coloring in imitation of the genuine color of another substance. If, therefore, the Wisconsin statute is valid, the conviction of the defendant in the instant case must be sustained.

In both of the Massachusetts cases the identical statute was involved. It appears from the statement of facts in the *Adams Case, supra,* that the defendant ordered of the plaintiffs a quantity of blended maple sugar, which should contain as much maple sugar as plaintiffs could put into the compound for the price agreed, to wit, ten and one-half to eleven and one-half cents per pound. Defendant's order was for an indefinite amount, up to 300 boxes, and plaintiffs made and shipped 3,415 pounds of the sugar, and they were ordered by defendant not to ship any more. Immediately on receiving the sugar defendant began reshipping

it to customers and sold about 500 pounds in cakes, and melted into syrup about 1,200 pounds more, and afterwards sold the syrup. The remainder was in defendant's possession at the time of the trial. Defendant notified plaintiffs that it would not accept the sugar, but would hold subject to their order. This blended sugar was composed of maple sugar and white or granulated sugar, made by mixing both kinds of sugar with water and boiling off the water and running the syrup into molds in which it hardened into cakes, which were light in color. Blended maple syrup thus made is a well known article in the trade, tastes better, and is better to eat than maple sugar not mixed with white or granulated sugar. In an action brought by the plaintiffs against the defendant to recover the balance due, the defense was interposed that the sale was in contravention of the statute above referred to. In the opinion it is said:

"It may be urged that the object of the statute is to prevent fraud upon the public, as it doubtless is, and that the defendant may have sold these packages to some one as pure maple sugar, and that the failure of the plaintiffs to mark them, although such failure was at the request of the defendant, contributed to the deception of such purchasers. Upon this part of the case the court found that a part of the sugar was in fact resold by the defendant to other persons, *but he further found that even if these sales were in any respect unlawful, the plaintiffs did not participate in them;* that the plaintiffs were wholly indifferent as to the use which the defendant might make of the sugar and had no knowledge of any intention on the part of the defendant to resell in violation of the law, if such intention in fact existed. Under these findings the subsequent transaction of the defendant, or its intention, would not prevent a recovery by the plaintiffs. *Graves v. Johnson,* 179 Mass. 53, 60 N. E. 383, 88 Am. St. Rep. 355, and cases cited. The case is simply a sale of an article of food, a mixture, it is true, of two other similar articles of food, but having a distinct name of its own and being known to the trade as a com-

mercial unit of food and sold and bought as such. *The sale of such an article under the circumstances disclosed by this case is not a sale of adulterated food or an imitation within the meaning of the statute."* (Italics ours.)

It thus appears that comment upon the *Adams Case* becomes unnecessary, mainly on account of the difference in the wording of the two statutes, and because in the *Adams Case* the blended product was sold to a dealer, and it was not shown that such sale was made with knowledge by the seller that the purchaser contemplated any resale with fraudulent intent, and because the blended substance so sold constituted a well known commercial unit, and because the label was omitted at the request of the defendant. The judgment of the lower court, therefore, was affirmed.

If at the time, however, of the sale made in the *Adams Case* the compound had been Van-Cu-Co in the form in which it is offered to the trade in Wisconsin, and if the Massachusetts statutes had been identical with the Wisconsin statutes, it can be plainly inferred that a different result would have been achieved.

In the instant case, as is indicated by the label, the imitation of the color of vanilla is achieved by the addition of caramel color to the compound, and it thus becomes clearly apparent that the object of the defendant in using such coloring matter is not for the purpose of adding an additional flavor or bouquet, but of producing a substance which in its appearance can readily be taken for vanilla extract. The use of mere coloring matter, even though the same be harmless, is equivalent to the use of a harmless dye; and where a dye is used to produce the color of another substance the court or jury is warranted in finding that the imitation so resulting was a conscious one and not a mere incident. Furthermore, the use of an ingredient which produces merely an imitation color is persuasive of a conscious

attempt to imitate, especially where, as here, the defendant had a choice of ingredients.    As is said in *Meyer v. State,* 134 Wis. 156, 165, 114 N. W. 501:

"If the article is in imitation of yellow butter, it matters not whether such imitation is brought about by the addition of a dye or by the selection of ingredients. . . . If one forming a compound of several ingredients knowingly select and use an ingredient which imparts to the compound the color of yellow butter, he having choice of ingredients, he will have made his compound in imitation of yellow butter just as well as if he selected a dye.    There is, however, this difference, viz.: proof of the presence of the dye, which can have no other function than that of producing color, shows the conscious imitation quite clearly, while proof of the selection of the ingredients which produce the color of yellow butter, the person selecting having a choice of ingredients, is a fact from which a jury is authorized to infer a conscious imitation notwithstanding such ingredient so selected has other qualities or is in one of its forms or in one of its colors a necessary ingredient of oleomargarine."

We now come to the second contention made by the learned counsel for the defendant, in which it is claimed that the statute is void because it is too general and indefinite, and in this behalf we quote the language in their brief, in which they say:   "It is a basic rule that a criminal statute should be so definite and certain that a defendant can know absolutely in advance whether or not a certain act will constitute a violation of the law."   This quotation is a proper exposition of the legal principle contended for, and has been substantially approved by the courts and by the law writers. Most of the pure food statutes create offenses which are *malum prohibitum* and not *malum in se.*    They should, therefore, be reasonably definite, and should not require a defendant to enter into the realm of speculation to determine whether he is or is not committing an offense.

We have before us in this case that portion of sub. (2), sec. 4601, subdivision sixth, which prohibits coloring in

Day-Bergwall Co. v. State, 190 Wis. 8.

imitation of the color of another substance.  As held in the *Meyer Case, supra,* this imitation must be a conscious imitation, and whether or not the element of consciousness exists in most cases creates an issue of fact.  How the defendant, under the facts appearing in the evidence, in view of the rule referred to in the *Meyer Case,* can assume the position which it takes on this objection raised to the statute, is not readily conceivable.  The imitation of vanilla extract in the manufacture of Van-Cu-Co must be a conscious imitation. The defendant knew when it added the caramel color that the addition did not produce a substantial new flavor, but it did know that caramel color in the proportion used would, to the eye, produce a product that looked like vanilla extract; in fact, the president of the company so testified. It stands to reason that where a manufacturer like the defendant, by the use of coloring matter, attempts to imitate another substance, the substance so imitated is invariably one of a higher grade, standard, or value.  It is this imitation which stimulates the sale of the product and which has a tendency to deceive the public.  So that in every instance the conscious imitation inherently implies knowledge and design.

While it must be admitted that a statute which definitely names the various substances which shall not be imitated would be more certain and desirable, it is extremely doubtful whether all of the numerous articles of food could be mentioned and whether such a statute would be practicable. The federal pure food law contains a provision that is almost identical with the Wisconsin statute involved, and yet this statute has been upon the books for many years and has successfully withstood the attacks made thereon upon this ground.  Sub. (2) of sec. 85.08 of the Statutes of Wisconsin for the year 1925 among other things provides:

"No person shall operate a motor vehicle recklessly or at a rate of speed greater than is reasonable and proper with

regard to the width, traffic and use of the highways and the rules of the road, or so as to endanger the property, life or limb of any person. . . . In turning corners and going around curves, at sharp declines, at the intersection of any street or crossroad, and where the view in the direction in which the vehicle is proceeding shall be obstructed, the driver shall so limit the speed of such vehicle as shall tend to avoid accidents."

A violation of this statute constitutes a criminal offense and is punishable accordingly. Under this statute the motor vehicle must be operated with regard to the width, traffic, and use of the highways. In each particular instance the operator of the machine is required to exercise reasonable care, based upon the actual situation that confronts him. It does not specify the width of the highway nor the amount of traffic on the highway, nor the use of the highway; it does not define what is a sharp decline; but in all cases requires the exercise of a certain standard degree of care, to the end that life, limb, and property may not be injured or damaged. No two situations under this statute are likely to be identical, and still, notwithstanding the uncertainty and indefiniteness of the statute, the legislature has seen fit to enact and retain it so that the purposes for which it was enacted may be secured. Nor can it be readily conceived how the statute could be made more definite and certain, and still a violation of the statute subject the offender to punishment as of a criminal offense. It is therefore the most practicable and workable statute that can be enacted. Similar statutes exist in most of the states, and we have been unable to find a single instance where it was held void upon the ground of indefiniteness or uncertainty. Many statutes of a similar nature could be referred to if it were thought necessary or desirable. This contention of defendant's counsel, therefore, cannot be sustained.

The statutes are also attacked upon constitutional grounds. The principles involved in such attacks have been

so often advanced in this court and in other courts, and particularly in the supreme court of the United States, that an extensive consideration of the same would serve no useful purpose. No subject of legislation of recent years is more closely affiliated with the health and welfare of our inhabitants than the pure food laws, and it may also be confidently asserted that none has been more violently and strenuously attacked. Selfishness and greed enter into all of the various activities of human beings to a greater or lesser extent, and innumerable instances might be cited where men of high standing and prominence in the community have devoted every effort and power not only to obstruct the passage of such laws, but to nullify them after they were passed.

We do not consider the violation in the instant case one of a serious nature. The product known as Van-Cu-Co is manufactured from ingredients which are not deleterious to the public health. The form in which the article is labeled, in itself inherently contains no element of deception. The sale of this product would not be a violation of the federal pure food laws. And yet, as has already been said, the article, by reason of its composition and its coloring, readily lends itself to the perpetration of fraud, and under such circumstances the legislature, in the exercise of its prerogative, is supreme, and its statutes cannot be annulled by the court without a usurpation of legislative power.

With these preliminary remarks, we will proceed to the consideration of the other objections raised in defendant's brief. The third point made is that the legislature in the enactment of sub. (2), sec. 4601, has made an arbitrary and unreasonable classification, and that therefore the statute is void. Here it must be remembered that the objects to be attained by pure food laws are, first, the preservation and protection of the public health, and second, the prevention of fraud. Sub. (2) of sec. 4601 declares that food shall

be deemed adulterated under certain conditions, and it then creates seven specifications. These specifications may be classified under three heads: First, foods which are absolutely prohibited as being deleterious to the public health. Under this class come the fifth and seventh specifications. The fifth consists of foods which are wholly or in part manufactured from diseased, contaminated, filthy, decomposed, tainted, or rotten animal or vegetable substances, etc. In the seventh specification are contained those foods which have an added substance or ingredient which is poisonous, etc., and therefore detrimental to the public health. Second, articles of food which are absolutely prohibited because they lend themselves readily to the perpetration of fraud upon the public. In this classification are included the fourth and sixth specifications. Under the fourth specification are foods which are offered or exposed for sale under the name of another article. The sixth specification includes foods which are mixed, colored, coated, polished, powdered, or stained, where damage or inferiority is concealed so that it tends to deceive or mislead the purchaser or consumer, or if by any means it is made to appear better or of greater value than it really is, or if it is colored or flavored in imitation of the genuine color or flavor of another substance. The third classification includes foods which can be manufactured and sold under certain conditions. Such foods are therefore only conditionally prohibited. This class includes the first, second, and third specifications. In the first specification are foods which have other substances mixed with them so as to lower or depreciate or injuriously affect their strength, quality, or purity. The second consists of foods where any inferior or cheaper substance or substances have been substituted wholly or in part for it; and the third, foods which have a valuable or necessary ingredient abstracted, or where the

food is below that standard of quality or purity represented to the purchaser or consumer.

The statute then provides that "any article of food which is not adulterated under the provisions of the fourth, fifth, sixth and seventh specifications of this section, and which does not contain any filler or ingredient which debases without adding food value, shall not be deemed adulterated in the case of mixtures or compounds sold under their own distinct names or under coined names, if the same be so labeled, branded or tagged as plainly to show their true character and composition."

A careful reading of this statute impresses us forcibly with the idea that if the legislature has power to classify, the same has been wisely and intelligently exercised. The question is not whether this classification is the best one which could be made, or whether it is invulnerable from criticism, nor is it necessary that it shall meet with universal approval. Such criticisms or objections should be presented to the legislature and not to the courts. It is only when such classification exceeds the bounds of reasonableness and propriety beyond a reasonable doubt that the courts are warranted in their interference in declaring the law unconstitutional upon that ground. As is said in *Wisconsin Asso. of Master Bakers v. Weigle,* 167 Wis. 569, 168 N. W. 383:

"It is only when it is made to appear clear beyond reasonable doubt that there are no just arguments or considerations of public policy which exist upon which the classification may be based that the court can declare the act of the legislature unreasonable in a legal sense and therefore void."

Speaking of the power of a legislative body to classify, the court further says:

"The rule permits the separation of persons and of property into classes, provided they have characteristics legitimately distinguishing the members of one class from those

of another in respects germane to some general public purpose. *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468."

Under the decision in the *Weigle Case, supra,* therefore, and numerous other decisions of this court, we conclude that the third defense advanced by the defendant cannot be sustained.

It is argued in the fourth point that the defendant practiced no deception and that the legislature cannot prohibit the sale of harmless articles of food. That there was a conscious imitation as to color of another substance was necessarily found by the court when the judgment was pronounced. The gravamen of the offense consists in the imitation and not in the use of harmful or deleterious substances. The object to be achieved by that portion of the statute herein involved is the prevention of fraud and not the preservation and protection of the public health. This alone, it would seem to us, would dispose of the attack upon this ground. It is conceded that the product was truthfully labeled. This was also the case in *Hebe Co. v. Shaw,* 248 U. S. 297, 39 Sup. Ct. 125, and in *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 189 N. W. 564. As appears from the citations in the brief of the learned attorney general in *Schmidinger v. Chicago,* 226 U. S. 578, 33 Sup. Ct. 182, the law establishing standard loaves of bread as to weight was declared valid, and this notwithstanding that the non-complying loaves were made of harmless materials and were otherwise of the same quality as the standard loaves. A law prohibiting artificial coloring of vinegar was sustained in *Weller v. State,* 53 Ohio St. 77, 40 N. E. 1001. See, also, *People v. Girard,* 145 N. Y. 105, 39 N. E. 823, and *People v. Girard,* 73 Hun, 457, 26 N. Y. Supp. 272. In *Purity E. & T. Co. v. Lynch,* 226 U. S. 192, 33 Sup. Ct. 44, the court held that a law prohibiting

Day-Bergwall Co. v. State, 190 Wis. 8.

the sale of all malt liquors is valid, for the reason that such a law is necessary for the effectual enforcement of the state prohibition act.   In the case last cited the court said:

"That the state in the exercise of its police power may prohibit the selling of intoxicating liquors is undoubted. . . . It is also well established that, when a state exerting its recognized authority undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective.   It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the government. . . . With the wisdom of the exercise of that judgment the court has no concern; and unless it clearly appears that the enactment has no substantial relation to a proper purpose, it cannot be said that the limit of legislative power has been transcended.   To hold otherwise would be to substitute judicial opinion of expediency for the will of the legislature, a notion foreign to our constitutional system. . . . The existence of this power . . . is not to be denied simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitrary fiat."

The principles pronounced in the *Lynch Case* also find apt and forcible expression in the case of *Pennell v. State,* 141 Wis. 35, 123 N. W. 115, where numerous authorities are cited in support thereof.   It cannot be said in the instant case that it clearly appears that the enactment has no substantial relation to a proper purpose, or that the act is not germane to the object and purpose of the legislation, which is to prevent fraud.   If an act which prohibits the manufacture and sale of a non-intoxicating malt extract or product, which is not only non-deleterious but is promotive of the public health, is valid, where the act has a substantial

relation to a proper purpose, viz. the protection of the public health, then certainly that portion of the statute herein involved, which has for its purpose the protection of the public from fraud, must also be sustained.

The fifth objection advanced to the validity of the law is based on the claim that the statute is unreasonable and arbitrary and is therefore unconstitutional. This question has heretofore been thoroughly considered and treated in this opinion, and further comment thereon becomes unnecessary.

Finally, in the sixth point raised, defendant's counsel contend that the Wisconsin statute conflicts with the federal statute, and that inasmuch as Congress has legislated upon the identical subject and has covered the field, the right of the legislature of Wisconsin to enact a law which in many respects conflicts with the federal law must be denied. The federal act of June 30, 1906, as amended August 23, 1912, March 3, 1913, and July 24, 1919 (34 U. S. Stats. at Large, 768, ch. 3915), among other things provides:

"Sec. 2.  That the introduction into any state or territory or the District of Columbia from any other state or territory or the District of Columbia, or from any foreign country, or shipment to any foreign country of any article of food or drugs which is adulterated or misbranded, within the meaning of this act, is hereby prohibited; and any person who shall ship or deliver for shipment from any state or territory or the District of Columbia to any other state or territory or the District of Columbia, or to a foreign country, or who shall receive in any state or territory or the District of Columbia from any other state or territory or the District of Columbia, or foreign country, and having so received, shall deliver, in original unbroken packages, for pay or otherwise, or offer to deliver to any other person, any such article so adulterated or misbranded within the meaning of this act, or any person who shall sell or offer for sale in the District of Columbia or the territories of the United States any such adulterated or misbranded foods

or drugs, or export or offer to export the same to any foreign country, shall be guilty of a misdemeanor," etc.

The rules and regulations made by the duly authorized departments pursuant to the said act, so far as material, read as follows:

Regulation 2. *Scope of the act.* "The provisions of the act apply to foods and to drugs which have been shipped or delivered for shipment in interstate commerce, or which are exported or offered for export to foreign countries, or which are being transported in interstate commerce for sale or have been transported in interstate commerce, or which have been received from a foreign country, or which are manufactured, sold, or offered for sale in the District of Columbia, territories of the United States, or insular possessions."

As will appear from a reading of the portion of the federal act above referred to, the main purpose of the act is to prohibit the transportation of adulterated foods in interstate commerce. *Weigle v. Curtice Bros. Co.* 248 U. S. 285, 39 Sup. Ct. 124. "While these regulations are within the power of Congress, it by no means follows that the state is not permitted to make regulations, with a view to the protection of its people against fraud or imposition by impure foods or drugs." *McDermott v. Wisconsin,* 228 U. S. 115, 33 Sup. Ct. 431. And while, as has heretofore been said, the Wisconsin statute in a number of respects is dissimilar to the federal statute, it is nevertheless clear that they operate and are intended to operate in different fields. So that it cannot be said that the federal act covers the entire field. The state statute, substantially in its present form, has existed and has been administered during a long period, and no instance has been called to our attention where it was claimed by the State that it applied to articles manufactured or shipped in interstate commerce. Such attitude on the part of the State as maintained by

those who have charge of the administration of the pure food laws, in itself must be accorded great weight in the construction and interpretation of the law. *Wright v. Forrestal,* 65 Wis. 341, 348, 27 N. W. 52. While the law itself is quite general in its wording, the presumption must be accorded to the legislature that it acted within the purview of its powers, and that it intended to legislate for the benefit of the inhabitants of the state in its effort to protect the public health and to prevent public frauds. The present action is based not upon the manufacture of an article transported in interstate commerce, but one in intrastate commerce. The ultimate purpose of the statute is to protect the consumer in the retail trade, and this becomes apparent from a careful reading of the statute. No language is used in the act which prohibits the manufacture within this state of an article in compliance with the federal statute and transporting it in interstate commerce; and, in fact, the use of the term "manufacture" is carefully avoided. So that it cannot be said in the instant case that the Wisconsin statute can be so construed as to extend its operation to a field over which the legislature has no power to act.

Counsel for the State request that the conviction upon the second count be set aside and the judgment reversed, for the reason that such judgment cannot be sustained under the evidence in this case. The request of the attorney general will be complied with.

*By the Court.*—The judgment and sentence of the lower court on the first count in the information is affirmed; that on the second count is reversed; and the cause is remanded with directions for further proceedings in accordance with this opinion. No costs shall be taxed against the defendant, but the defendant is required to pay the clerk's fees in this court.

A motion for a rehearing was denied, with $25 costs, on May 11, 1926.