DAIRY QUEEN OF WISCONSIN, INC., Appellant, vs. Mc-DOWELL, Director of State Department of Agriculture, Respondent.*

*December 6, 1951—January 8, 1952.*

* Motion for rehearing denied, without costs, on April 8, 1952.

472

For the appellant there were briefs by *Flynn & Green-quist,* and oral argument by *G. L. Flynn* and *William R. Stroemer,* all of Racine.

For the respondent there were briefs by the *Attorney General* and *Richard E. Barrett,* assistant attorney general, and oral argument by *Mr. Barrett.*

A brief *amici curiae* was filed by *George L. Mooney* of Plymouth, *George M. St. Peter* of Fond du Lac, and *Ela, Christianson & Ela* of Madison, on motion for rehearing.

MARTIN, J.   Two questions are presented on this appeal:

1. Does sec. 97.025, Stats., prohibit the manufacture and sale of appellant's product?

2. If so, is the statute constitutional?

Most of the facts were stipulated, there being few, if any, in dispute, and those not in sharp conflict. Here we have the trial court applying the law to the facts or the facts to the law, as it sees it. In such cases this court is not bound by the findings of the trial court, and the rule that the findings must be sustained unless against the great weight and clear preponderance of the evidence is not applicable. *Will of Mechler* (1944), 246 Wis. 45, 16 N. W. (2d) 373.

The lower court held that the statutes mentioned prohibit the sale of Dairy Queen as an imitation of ice cream and as an adulterated product or substandard ice cream. We do not agree.

There is no question but that Dairy Queen is a healthful and nutritious food. That fact is stipulated. The essential elements, so far as nutrition is concerned, are contained in the skim milk. These elements are present in greater quantity in Dairy Queen than in ice cream.

Certain types of ice cream may legally have a fat content of not less than eleven per cent. The fat content of sherbet and ices is to be not more than three and one-half per cent. Thus, Dairy Queen, having a fat content of six per cent, falls in the "no man's land" in between. Respondent contends that the purpose of these legislative requirements as to butterfat content was to keep a wide margin between the two classes of frozen milk products, and that the sale of a six per cent product would work a fraud upon the public.

Counsel conceded on oral argument that the only reason for barring the sale of Dairy Queen was that it might perpetrate a fraud upon the consumer. The question then follows, Is it necessary to bar the product, or has the department sufficient authority under ch. 93, Stats., to so regulate it as to prevent fraud?

*Hutchinson Ice Cream Co. v. Iowa* (1916), 242 U. S. 153, 37 Sup. Ct. 28, 61 L. Ed. 217, upheld the constitutionality of an act fixing minimum standards of ice cream on the ground that its purpose was to prevent the perpetration of fraud on the public from inferior makes of ice cream. The United States supreme court said that the acts there considered merely prohibited the sale of certain compounds *as ice cream.* That is what the statutes here prohibit. The court specifically said that it was not called upon to determine whether the state of Iowa could, in the exercise of its police power, prohibit the sale of a wholesome product if the public welfare appeared to require such action.

We cannot infer from the provisions of sec. 97.02, Stats., that the legislature meant to bar the sale of all frozen dairy

products having a fat content between three and one-half and eleven per cent. Dairy Queen is not ice cream, and it is within the authority of the respondent to so regulate its sale that the public may know it is not ice cream.

In *Rigbers v. Atlanta* (1910), 7 Ga. App. 411, 413, 66 S. E. 991, in considering a municipal ordinance providing for a butterfat content in ice cream of at least ten per cent, the court said:

"It will be noticed that under this ordinance the prohibition is not against selling ice cream of less than the prescribed percentage, as ice cream, but against selling it at all. Though the seller distinctly informs the purchaser that the ice cream contains less butterfats than ten per cent, the sale is unlawful, according to the ordinance. Even if the city has the power to prescribe that no ice cream of less than a certain percentage of richness in butterfats shall be sold as standard ice cream, it still would not have the power to say that ice cream below that standard should not be sold at all. For instance, it might be permissible to say that the term 'ice cream,' or 'standard ice cream,' or 'first-class ice cream,' should relate only to ice cream of a certain prescribed richness, and that whoever sold ice cream of poorer quality should, either by calling it under some other name, or by indicating on the vessel in which it is delivered, or otherwise, disclose the inferiority of its quality. But under the ordinance before us, if a physician desired that a patient should have ice cream, but did not deem it safe for him to take the richer ice cream, it would be illegal for any one to furnish the grade of ice cream actually suited to the sick man's physical condition."

The court there held that the ordinance was so unreasonable that it could not be upheld.

It is contended that Dairy Queen is an imitation ice cream in that it resembles ice cream in taste, texture, and consistency. Appellant does not concede this, but even if it were so, a resemblance to ice cream does not make the product an imitation. There is no artificiality employed in producing

Dairy Queen. Its ingredients are the same natural ingredients contained in ice cream, but in different proportions. We can see where imitation and adulteration may be present and fraud perpetrated upon the public where, as in *Carolene Products Co. v. United States* (1944), 323 U. S. 18, 65 Sup. Ct. 1, 89 L. Ed. 15, abstracted butterfat is replaced with vegetable oil; and where, as in *Day-Bergwall Co. v. State* (1926), 190 Wis. 8, 207 N. W. 959, the product was admittedly an *artificial* vanilla.

In *United States v. 62 Cases* (10th Cir. 1950), 183 Fed. (2d) 1014, 1018, it was said:

"If it is sold *under a name* of a food for which a definition and standard has been prescribed, if it looks and tastes like such a food, if it is bought, sold, and ordered *as such a food,* and if it is served to customers *as such a food,* then it purports to be, and is represented to be, such a food." (Emphasis ours.)

According to the stipulation, Dairy Queen will not be sold as ice cream. Whatever resemblance it may have to ice cream, therefore, cannot mislead the public in buying it.

Respondent argues that in removing some of the butterfat, which is the more expensive ingredient, and adding more of the cheaper nonfat solids, the appellant manufactures an inexpensive product which would tempt retailers to pass it off as ice cream. This so-called substitution has no effect upon the wholesomeness or nutritious properties of the product, and is not sufficient reason to bar it, especially in view of the authority granted to the respondent by ch. 93, Stats., to regulate its manufacture and sale.

Under ch. 93, Stats., the department of agriculture has the power to establish standards for food products and to prescribe regulations governing marks and tags upon such products. Those standards shall not affect the right of any person to dispose of a food product not conforming to the

standards, sec. 93.09 (4), Stats., "but such person may be required to mark or tag such product, in such a manner as the department may direct, to indicate that it is not intended to be marketed as of a grade contained in the standard and to show any other fact regarding which marking or tagging may be required under this section." The purpose is clear. The legislature does not intend to deny any person the right to make and sell a food product so long as its consumption does not endanger public health and welfare. It does intend, however, to so regulate its sale that the public is not subjected to the injury of buying a product different from that which is intended to be bought. See *New Orleans v. Toca* (1917), 141 La. 551, 75 So. 238.

We do not agree with respondent's contention that products such as Dairy Queen are difficult to label. It seems to us that the proposed method of selling Dairy Queen—in a store of its own, where no other product is sold; with a posted sign that the product is not ice cream and the containers are so labeled—and where it will not be sold outside its containers, such as in restaurants and the like— will not perpetrate a fraud upon the public. Furthermore, the department may impose any other regulation which it deems necessary to advise the public that what it is buying is not ice cream.

The provision of sec. 97.25 (3), Stats., which declares certain "adulterated" foods not adulterated if sold under their own "distinct names, if labeled to show true character and composition" is applicable to Dairy Queen, since, as we have held, it is not an imitation of ice cream.

It is our conclusion that the general welfare does not require prohibition of the manufacture and sale of the product here in question, the power of regulation being sufficient to prevent any fraud upon the consuming public.

Since our holding with respect to the first question presented is that sec. 97.025, Stats., and the related statutes involved do not prohibit the manufacture and sale of Dairy Queen, it is unnecessary to consider the constitutional question.

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment consistent with this opinion.

The following opinion was filed April 8, 1952:

PER CURIAM (*on motion for rehearing*). The brief filed on the motion for rehearing by *amici curiae* is submitted on behalf of several organizations of farmers, and dealers in and manufacturers of dairy products, including an association of about eighty-five Wisconsin manufacturers of ice cream. It opens with a statement of the reason for its filing and there suggests that the effect of the decision is to destroy a generation's work in fixing dairy-product standards and the destruction of the reputation of the state acquired by its maintenance of those standards which is of great importance to the economy of the state, urban as well as rural; and that "maintenance of adequate standards for the protection of consumers is of infinitely greater importance to the entire people of the state than are the economic interests of the promoters of any product or class of products such as 'Dairy Queen.'"

We should ordinarily hesitate to discuss the effect of the decision upon the economy of the state, for that appears to be a matter peculiarly for the legislature acting within constitutional limitations. We consider, however, that counsels' suggestions regarding that aspect of the case permit, if they do not require, us to respond.

We doubt that Wisconsin's dairy farmers will suffer loss by the introduction into the retail market of a new product which is stipulated to be "a nourishing, wholesome, and healthful food and contains no element deleterious to health," and which the trial judge observed from demonstration to be "more tasty and palatable than soft ice cream." On the contrary, it would seem that the proposal of the plaintiff to engage in business in this state would open a new market and a new demand for the farmer's milk, if for no other reason than that it would provide a substitute containing a lesser amount of fat for those who for various reasons are denied the pleasure of eating ice cream. The argument that the interests of the dairy farmer will be prejudicially affected by this decision is not based on experience or logic.

As to the consumer—the plaintiff offers to sell him a "nourishing, wholesome, and healthful food" which contains no deleterious substance, to be manufactured and sold "under the supervision and control and in conformity with the rules and regulations for sanitation;" it is so stipulated. It is also stipulated that the product will be advertised to "indicate that the product being sold is Dairy Queen; that a sign will be posted at all places of sale stating that the product sold is not ice cream or sherbet." No threat of danger to the public health appears from this proposal. Nor does it appear that the product will be offered to the consumer "in imitation of ice cream."

*Amici curiae* say that "maintenance of adequate standards for the protection of consumers is of infinitely greater importance to the entire people of the state than are the economic interests of the promoters of any product or class of product such as 'Dairy Queen.'" To that we agree. We might inquire in response to the suggestion whether it is proper, in the absence of any showing that sale of the product would prejudicially affect either the milk producer or the consuming public, that the legislature or the court should

be party to an act which appears to have no purpose except to protect the interests of the eighty-five manufacturers of ice cream who now appear here against the competition of Dairy Queen.

If we must construe sec. 97.025 (1), Stats., as meaning that by its enactment the legislature intended absolutely to prohibit the sale of a product such as plaintiff's whether or not it be sold in imitation of ice cream, then we run squarely into the rule of *John F. Jelke Co. v. Emery* (1927), 193 Wis. 311, 214 N. W. 369, which, so far as we have been able to find, has not been since referred to by either this court or the United States supreme court. Given that construction, the rule of the *Jelke Case* requires that we hold the statute invalid.

In that case the court had for consideration ch. 279, Laws of 1925, an enactment intended to prohibit absolutely the sale of oleomargarine. It purported to make it unlawful to manufacture, sell, or expose for sale any article "which is or may be used as a substitute for butter." The purpose of sec. 97.025, Stats., to prohibit absolutely the sale of a product such as plaintiff's is expressed just as clearly; it provides that no person manufacture, sell, or expose for sale any product which "shall be in imitation of ice cream, etc." It appears from the stipulation that Dairy Queen resembles ice cream in its appearance, but that it is to be sold upon its own merits and under such circumstances that the purchaser will not be deceived into believing that he is buying ice cream. It was conceded in the *Jelke Case* that the sale of oleomargarine effects a loss to the dairy industry. Despite that concession the enactment was held to be invalid.

The arguments of *amici curiae* seem better adapted to promote a restricted market for the dairy farmer's product and to control the forms in which the consumer may enjoy it. To sustain their contention would be to encourage monopoly by preventing the introduction of a wholesome product.

What was said by the court in the *Jelke Case* is applicable here (p. 323):

"Under the facts proven in this case, whatever the economics of the situation may be, from the standpoint of constitutional right the legislature has no more power to prohibit the manufacture and sale of oleomargarine in aid of the dairy industry than it would have to prohibit the raising of sheep in aid of the beef-cattle industry or to prohibit the manufacture and sale of cement for the benefit of the lumber industry. In some cases a proper exercise of the police power results in advantage to a particular class of citizens and to the disadvantage of others. When that is the principal purpose of the measure, courts will look behind even the declared intent of legislatures and relieve citizens against oppressive acts where the primary purpose is not the protection of the public health, safety, or morals."

It is urged that the decisions of the United States supreme court in *Carolene Products Co. v. United States* (1944), 323 U. S. 18, 65 Sup. Ct. 1, 89 L. Ed. 15, and *Federal Security Adm'r v. Quaker Oats Co.* (1943), 318 U. S. 218, 63 Sup. Ct. 589, 87 L. Ed. 724, require us to hold sec. 97.025, Stats., valid. We prefer to abide by the rule of the *Jelke Case* and to conclude that if a law creating, maintaining, or sustaining a monopoly and purporting to prevent the sale of a wholesome product under circumstances which will not deceive the public, and to be sold without injury to any group except the monopoly is to be declared a valid enactment, some other court be called upon to do so.

Motion for rehearing denied.

CURRIE, J. (*dissenting on motion for rehearing*). Sec. 97.025 (1), Stats., prohibits the sale, etc., of "any *article, product,* or *compound* made wholly or partly out of milk, cream, sweetening ingredient, flavoring, with or without coloring or eggs, *which shall be in imitation of ice cream, sherbet, or ices as defined by sec. 97.02.*"

The error we made in construing the above-quoted portion of sec. 97.025 (1), Stats., in the original opinion in this case was in assuming that the method and manner of sale determines whether a product is an imitation of ice cream, or not. It was not the intention of the legislature that the method of sale of a product, including the labeling or advertising thereof, shall determine whether or not it is an imitation ice cream, but that *such determination must be made from the product itself,* irrespective of how sold.

The legislature by sec. 97.025 (1), Stats., did not prohibit merely the *"sale" "in imitation of ice cream"* of a product such as Dairy Queen resembling ice cream but having a butterfat content in between that of ice cream and sherbet, as defined by sec. 97.02 (10) and (10a), but it went further and absolutely prohibited the sale of such a product as Dairy Queen if it (*the product, not sale thereof*) was "an imitation of ice cream."

During World War II, when the federal government rationed the amount of milk solids that might be used in frozen dairy foods, the legislature enacted as a temporary war measure ch. 5, Laws of 1943, which reduced the minimum fat requirements for ice cream to eight per cent for the duration of the war emergency only, thus enabling a greater quantity of ice cream to be made from the available amount of milk solids. An ice cream having a butterfat of eight per cent is very similar to Dairy Queen with its six per cent fat content. This statute legalizing ice cream with an eight per cent fat content was repealed by ch. 586, Laws of 1945. In the 1949 session of the legislature, Bill 343, S., was introduced, and in the 1951 session of the legislature, Bill 417, S., was introduced, both of which provided for legalizing an iced dairy-food product with a fat content in between sherbet and ice cream, such product to be known as "iced milk." The purpose of such bills was to legalize a

product such as Dairy Queen, but both bills were killed by the legislature. These facts are further evidence of the legislative intent to prohibit the sale in Wisconsin of a product such as Dairy Queen having a milk-fat content in between that of sherbet and ice cream.

The learned trial judge personally examined and tasted Dairy Queen and upon the evidence produced and his own personal examination and tasting he found in his findings of fact as follows:

"4. That 'Dairy Queen' is a partially frozen food product similar to ice cream, as defined by sec. 97.02 (10) of the Wisconsin statutes, in its appearance, odor, taste, and texture or consistency; . . .

"9. That 'Dairy Queen' so closely resembles ice cream in appearance, taste, and texture or consistency that it can be readily substituted for and sold as ice cream; that evidence of this fact has been obtained by inspectors of the dairy and food division of the state department of agriculture in states where 'Dairy Queen' has been licensed."

It is an elementary principle of law that the findings of a trial court, if supported by evidence, will not be disturbed unless the same be against the great weight and clear preponderance of the evidence. *Depies-Heus Oil Co. v. Sielaff* (1944), 246 Wis. 36, 16 N. W. (2d) 386; *Angers v. Sabatinelli* (1945), 246 Wis. 374, 17 N. W. (2d) 282, 18 N. W. (2d) 705.

All discussion that the plaintiff's program of selling Dairy Queen does not contemplate the sale of its product as an imitation of ice cream by use of signs, labeling, or containers, etc., is therefore beside the point because the legislature, by absolutely prohibiting the sale of an imitation product, left no discretion in the department of agriculture to regulate its sale through proper signs, etc., so as to prevent confusion, deception, and fraud of the consuming public.

Sec. 97.25 (3), Stats., referred to in the original opinion (which statute declares certain "adulterated" foods not adulterated if sold under their own "distinct names, if labeled to show true character and composition"), has no application to Dairy Queen because this is not a case of an "adulterated" food but an "imitation" product.

Sec. 93.09, Stats., which provides that the department of agriculture "may establish standards *for the grade* of food products" gives the department no authority to regulate conditions of sale to protect the public against confusion, deception, and fraud by products which resemble standardized products. This section does not delegate to the department any labeling powers except labels for *grades* of products which conform to the legislative standards. Under that section the department could establish *grades* of ice cream and labels for the respective grades, thus controlling to that extent the sales of so-called premium ice creams which claim higher than minimum fat content. But the department's authority is limited to this power, and does not extend to labeling products which are not defined, or whose sale is not permitted by the legislature.

In some few cases the legislature has itself specified labels for products which resemble standardized products but which are substandard. It has fixed the labeling for cheese which is wholesome but substandard because of high moisture content (sec. 97.49, Stats.). It has fixed the labeling for renovated butter (sec. 97.45); and until cheese from standardized milk was permitted in 1951, it required cheese made from skim milk to be in a distinctive shape, a form of labeling (sec. 97.43).

This refusal of the legislature to rely on labeling for the protection of consumers is reasonable and has been the approach of congress in the Food, Drug and Cosmetic Act

in providing for standards of identity. As the United States supreme court said in *Federal Security Adm'r v. Quaker Oats Co.* (1943), 318 U. S. 218, 230, 63 Sup. Ct. 589, 87 L. Ed. 724:

"The provisions [of the federal law] for standards of identity thus reflect a recognition by congress of the inability of consumers in some cases to determine, solely on the basis of informative labeling, the relative merits of a variety of products superficially resembling each other."

Being satisfied that sec. 97.025 (1), Stats., absolutely forbids the sale of Dairy Queen as an imitation of ice cream, there remains the question of whether such a statute is unconstitutional. The memorandum decision on the motion for rehearing cites the case of *John F. Jelke v. Emery* (1927), 193 Wis. 311, 214 N. W. 369, as holding that if so construed the statute must be held to be unconstitutional as being in violation of the due-process clause of the Fourteenth amendment to the United States constitution. The statute before the court in the *Jelke Case* was one which prohibited the sale of oleomargarine in the state.

The United States supreme court is the final arbiter of what regulatory measures adopted by the legislatures of the various states in the exercise of the states' police power do or do not violate the due-process clause. The decision of that court in *Federal Security Adm'r v. Quaker Oats Co., supra,* in which the opinion was written by Mr. Chief Justice Stone, would seem to be directly in point. In that case the federal security administrator, acting pursuant to the federal Food, Drug and Cosmetic Act promulgated regulations establishing "standards of identity" for various milled-wheat products, excluding vitamin D from the defined standard of "farina" and permitting it only in "enriched farina," which was required to contain vitamin $B_1$, riboflavin, nicotinic acid, and iron. The Quaker Oats Company had for

the past ten years manufactured and marketed a wheat product commonly used as a cereal food, consisting of farina to which vitamin D had been added, but to which was not added the other elements necessary to qualify it to be sold under the regulations of "enriched farina." The packages, however, bore a label correctly stating the amount of vitamin D per ounce contained in the product. There was no question but that the cereal so marketed by Quaker Oats Company was a wholesome food product but it did violate the regulations. The question was then whether the regulations were valid in absolutely prohibiting the sale of such cereal. The court upheld the validity of the regulations and it stated (p. 230):

"The provisions for standards of identity thus reflect a recognition by congress of the inability of consumers in some cases to determine, solely on the basis of informative labeling, the relative merits of a variety of products superficially resembling each other. We cannot say that such a standard of identity, designed to eliminate a source of confusion to purchasers—which otherwise would be likely to facilitate unfair dealing and make protection of the consumer difficult—will not 'promote honesty and fair dealing' within the meaning of the statute."

In *Carolene Products Co. v. United States* (1944), 323 U. S. 18, 65 Sup. Ct. 1, 89 L. Ed. 15, the Carolene Company contended that if the federal Filled Milk Act was held to be applicable to the products it manufactured and shipped in interstate commerce, the act, as thus applied, violated the due-process clause. The company based this contention upon the fact that Carolene was a wholesome and beneficial food product, fairly labeled, and sold on its merits without fraud to the public, and having none of the nutritional deficiencies for which congress prohibited the interstate shipment of "filled milk." The process of manufacturing Carolene consisted of taking natural cottonseed or cocoanut oil or fish-liver oil, which latter oil contains vitamins A and D. The

compound was sold under the name of Carolene, and other trade names, in cans of the same size and shape as those used for evaporated milk, but the cans were truthfully labeled to show the ingredients. So far as the record disclosed the company's products were equally as wholesome and nutritious as milk with the same content of vitamins and calories. The court in its decision upholding the constitutionality of the act said (pp. 23, 24, 31):

"The possibility and actuality of confusion, deception, and substitution was appraised by congress. The prevention of such practices or dangers through control of shipments in interstate commerce is within the power of congress. . . .

"Congress evidently determined that exclusion from commerce of filled-milk compounds in the semblance of milk was an appropriate method to strike at evils which it desired to suppress. Although it now is made to appear that one evil, the nutritional deficiencies, has been overcome, the evil of confusion remains and congress has left the statute in effect. . . .

"Here a milk product, skimmed milk, from which a valuable element—butterfat—has been removed is artificially enriched with cheaper fats and vitamins so that it is indistinguishable in the eyes of the average purchaser from whole-milk products. The result is that the compound is confused with and passed off as the whole-milk product *in spite of proper labeling*.

"When congress exercises a delegated power such as that over interstate commerce, the methods which it employs to carry out its purposes are beyond attack without a clear and convincing showing that there is no rational basis for the legislation; that it is an arbitrary fiat. This is not shown here."

There is a "rational basis" (to use the language of the United States supreme court in the *Carolene Case*) for the Wisconsin legislature to set a certain minimum butterfat content for ice cream and to absolutely prohibit the sale of

any other frozen milk product that does not have the specified minimum amount of butterfat, which in taste, texture, or appearance might be confused with ice cream. Both Dairy Queen and ice cream are made from milk and cream, or products extracted therefrom. There is a much more rational basis for excluding Dairy Queen from sale than oleomargarine, because oleomargarine is an entirely different product than butter, and the making of it is an entirely different industry than the making of butter. The making of Dairy Queen does not differ materially from the making of ice cream, and all that the manufacturer of it has to do in order to sell its product legally in Wisconsin is to see that it contains the minimum amount of butterfat required by the statute. However, butterfat is much more expensive than milk solids and, if the manufacturer of Dairy Queen were required to meet the butterfat standards of the statute, the competitive advantage over ice cream because of the lower cost of its ingredients would be lost. This feature, however, does not render the statute prohibiting its sale unconstitutional, on the ground that it promotes monopoly, but is a further justification of the action of the legislature in trying to protect the buying public from the purchasing of a cheaper product made in imitation of a more expensive one.

The comparative nutritional values of milk fat as compared to milk solids was not an issue in the trial below, nor is it on this appeal. However, the evidence disclosed that the market price of milk fat is approximately one dollar per pound and that of milk solids about eleven cents per pound. Furthermore, the legislature has placed great store on the percentage of milk fat in the standards it has established for milk and dairy products. This court can well take judicial notice that the nutritive value of milk fat is essentially calories, and that it provides a concentrated form of energy, and is a carrier of fat-soluble vitamins. These facts provide a reasonable

basis for the legislature establishing standards of dairy products on the basis of milk-fat content.

The memorandum opinion denying the motion for rehearing states that permitting the sale of Dairy Queen will help the farmers by giving them an additional outlet for their milk. In addition to being entirely immaterial on the legal issues presented, it is doubtful if future events will demonstrate it to have been a correct prophesy. Dairy Queen is sold in competition with ice cream and for every sale of a cone of Dairy Queen to a customer there is the likelihood that there has been lost the sale of a cone of ice cream. The farmers receive a higher price for the milk and butterfat ingredients of ice cream than they do for Dairy Queen because of the much higher price that they receive per pound for butterfat than for milk solids.

I am authorized to state that Mr. Justice BROADFOOT joins in this dissent.