CLARK OIL & REFINING CORPORATION, Respondent, v.
CITY OF TOMAH, Appellant.

*March 3—April 12, 1966.*

548

For the appellant there were briefs by *Lawrence S. Clark* of Tomah, and *Edwin Larkin* of Mondovi, and oral argument by *Mr. Larkin*.

For the respondent there was a brief by *Thomas F. McCaul* of Tomah, and *Hale, Skemp, Hanson, Schnurrer & Skemp* of La Crosse, and oral argument by *William P. Skemp*.

WILKIE, J.  The city of Tomah has a population of about 5,000. U. S. Highway 12 cuts through this Monroe county city. Superior avenue (part of the highway) is Tomah's main street. The Clark station is located at the corner of Superior avenue and Saratoga street. The station has two islands from which gasoline is pumped. It has two below-ground, properly vented storage tanks, each with a capacity of 6,000 gallons. Clark sells about 22,000 gallons each month from this station.

Because of the disputed ordinance Clark was forced to buy gasoline from a local bulk operator who delivered the gasoline in a 1,500-gallon truck (tank wagon). Clark would prefer to have the gasoline delivered to its station directly from its bulk facilities near Milwaukee, trans-

porting the gasoline in 8,000-gallon tractor-trailer tank trucks (transports). By doing this Clark would save five cents per gallon.

To protect "the public safety and welfare" the city council of Tomah adopted ordinance No. 381, the pertinent provisions of which are as follows:

"The Common Council of the City of Tomah do ordain as follows:

"1. No person, partnership or corporation shall park or permit the parking of any motor trucks, trailers, semi-trailers, tank trucks or any other vehicles used for the transportation of Class I, II or III liquid petroleum products, as defined in the Wisconsin State Flammable Liquids Code, whether loaded or empty on any public street, highway or alley or open space in the City of Tomah except for the purpose of making repairs thereto or complying with traffic regulations or for delivering of Class III liquids to any premises.

"2. No person, partnership or corporation shall for any purposes with any motor truck, trailer, semi-trailer, tank truck or other vehicles used for the transportation of Class I or II liquid petroleum products, having a carrying or storage capacity in excess of 1,500 gallons, deliver any Class I or II liquid petroleum products, as defined in the Wisconsin State Flammable Liquids Code to any premises in the City of Tomah, except to an authorized bulk plant situated in a location so classified by the zoning and other ordinances of the City of Tomah as to permit of the operation of a bulk plant at that location, and except to railroad premises in the usual course of business under all regulations applicable thereto.

"3. No person, partnership or corporation shall transfer Class I or II liquid petroleum products, as defined in the Wisconsin State Flammable Liquids Code, from any truck, trailer, semi-trailer, tank truck or other vehicle used for the transportation of such products with any equipment, or in any manner, not authorized by applicable Federal and State laws or ordinances of the City of Tomah.

"4. Each of the subsections of this section are hereby declared to be severable and enacted under police power of the City of Tomah as a reasonable and necessary regu-

lation in the protection of the public safety and welfare. All other Ordinances heretofore adopted by the City of Tomah, inconsistent with the provisions of this Ordinance are hereby repealed.

"5. Any person, firm or corporation who shall violate any provision of this ordinance shall be subject to prosecution therefore and upon conviction thereof shall be punished by payment of forfeiture of not less than Fifty Dollars ($50.00) and not to exceed One Hundred Dollars ($100.00) for each offense, together with the costs of prosecution. Each separate day upon which a provision hereof shall be violated shall constitute a separate offense."

This ordinance renders illegal Clark's desired method of accomplishing gasoline deliveries to its Tomah station. Clark attacks the whole ordinance as an unreasonable and therefore unconstitutional exercise of the police power.

The three specific issues raised on this appeal concern the validity of the provisions of the first three sections of the ordinance: Section 1—prohibiting parking of petroleum vehicles, whether empty or loaded with flammable fluids, section 2—prohibiting transport of flammable fluids in trucks of more than 1,500-gallon capacity, and section 3—prohibiting transfer of these fluids from such trucks.

The trial court concluded that both sections 1 and 2 were unconstitutional; that, indeed, the entire ordinance was unconstitutional. Respondent urges that in reviewing the trial court's findings and conclusions this court is bound by the usual rule governing supreme court review of trial court findings and conclusions, to wit, that they are to be upheld unless against the great weight and clear preponderance of the evidence.[1] This is correct only insofar as the findings of the trial court concern themselves with adjudicative facts, *e. g.*, the size, location, time of leasing, physical characteristics, tank capacity, and

---

[1] *Boehck Construction Equipment Corp. v. O'Brien* (1966), 29 Wis. (2d) 649, 652, 139 N. W. (2d) 650; *Huber Glass Co. v. First Nat. Bank* (1965), 29 Wis. (2d) 106, 109, 138 N. W. (2d) 157.

monthly gallonage of the Clark station, as distinguished from conclusions of law or matters of legislative choice.

Except as to these adjudicative facts, the scope of an appellate court's review of a trial court's findings and conclusions was well stated by the United States supreme court in *South Carolina Highway Dept. v. Barnwell Brothers*,[2] as follows:

"Since the adoption of one weight or width regulation, rather than another, is a legislative not a judicial choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard. Cf. *Worcester County Trust Co. v. Riley*, 302 U. S. 292, 299. Being a legislative judgment it is presumed to be supported by facts known to the legislature unless facts judicially known or proved preclude that possibility. Hence, in reviewing the present determination we examine the record, not to see whether the findings of the court below are supported by evidence, but to ascertain upon the whole record whether it is possible to say that the legislative choice is without rational basis. *Standard Oil Co. v. Marysville, supra; Borden's Farm Products Co. v. Ten Eyck*, 297 U. S. 251, 263; s. c. 11 F. Supp. 599, 600. Not only does the record fail to exclude that possibility, but it shows affirmatively that there is adequate support for the legislative judgment."

The most crucial section of the ordinance is section 2, which prohibits transporting gasoline in Tomah for delivery to retail stations there in trucks holding 1,500 gallons or more. When the validity of a city ordinance enacted under its police power is challenged several well-recognized rules are applied by the courts in determining whether or not the ordinance is constitutional.

The ordinance is presumed constitutional and the attacking party must establish its invalidity beyond a reasonable doubt.[3]

---

[2] (1938), 303 U. S. 177, 191, 58 Sup. Ct. 510, 82 L. Ed. 734.

[3] *J & N Corp. v. Green Bay* (1965), 28 Wis. (2d) 583, 585, 137 N. W. (2d) 434; *Courtesy Cab Co. v. Johnson* (1960), 10 Wis. (2d) 426, 431, 103 N. W. (2d) 17.

The ordinance must be sustained if there is any reasonable basis for its enactment,[4] and the courts will only interfere with the exercise of police power by a municipality when it is clearly illegal.[5]

The function of a reviewing court is solely for the purpose of determining whether legislative action under the power delegated to the municipality passes boundaries of its limitations or exceeds boundaries of reason.[6]

Is there any rational basis for a legislative choice supporting the ordinance? [7]

In our opinion Clark has sustained its burden of proof demonstrating that there is no reasonable view that could have been picked by the council by which it can be demonstrated that this section of the ordinance promotes safety and the general welfare.

It is undisputed that in Tomah most of the homes are wood; that the buildings in the mercantile area are mostly brick veneer with wooden floors or stairways; that Tomah has about 1,500 residential water meters and about 200 commercial water meters; that Tomah has a storm and sanitary sewer system; that it has a volunteer fire department.

Appellant relies on opinion testimony by Tomah Fire Chief Giesler that deliveries in 8,000-gallon trucks are more hazardous than deliveries in 1,500-gallon vehicles and by William Clark, the supervisor of fire service training for the state board of vocational and adult education, that semitrailers are very likely to overturn, spilling gasoline onto the street and into the Tomah sewer system.

[4] *J & N Corp. v. Green Bay, supra,* footnote 3, at page 585; *Courtesy Cab Co. v. Johnson, supra,* footnote 3, at page 432.

[5] *J & N Corp. v. Green Bay, supra,* footnote 3, at page 585; *Courtesy Cab Co. v. Johnson, supra,* footnote 3, at page 432.

[6] *Yorkville v. Fonk* (1958), 3 Wis. (2d) 371, 375, 88 N. W. (2d) 319, appeal dismissed, 358 U. S. 58, 79 Sup. Ct. 110, 3 L. Ed. (2d) 48.

[7] *South Carolina Highway Dept. v. Barnwell Brothers, supra,* footnote 2.

William Clark's comments are directed to possibilities of danger while the larger truck is being driven. Yet section 2 concerns itself only with prohibiting delivery. It places no restriction on trucks driving through Tomah or even in Tomah if they are headed for a bulk tank or railroad yard. His opinion is limited to only that part of the hazard created by the moving vehicles which is limited to those trucks destined to make deliveries of gasoline to local retail stations.

The testimony of Clark and Giesler is completely demolished by the evidence introduced by respondent.

It is undisputed that it is the gasoline vapor and not the gasoline itself which burns. There was testimony by respondent's witnesses to the effect that the insurance rates for the 1,500-gallon tank wagon and the 8,000-gallon transport were the same, that the construction of the 8,000-gallon transport met with state and federal requirements, that the larger transports had safety devices (internal compartments with self-closing valves and "tite fill" caps and "tite fill" hoses) not present on the 1,500-gallon vehicle, that these caps and hoses provided an air-tight connection between the truck and underground tanks thereby preventing the escape of vapor, that the Tomah ordinance would actually increase the fire hazard, and that it was highly improbable that the bulkheads of the 8,000-gallon transport would rupture so as to dump the entire contents at once.

More particularly, John Pavlik, the West Milwaukee fire chief, Charles Miller, a field engineer for the Mobile Oil company, George Prussing, a fire protection engineer, and John Ainlay, an official of the central region committee of the American Petroleum Institute, all explained that the greatest danger of fire is presented when gasoline is being transferred from the truck into the underground tank and that, therefore, it would be safer because of fewer exposures, to make one delivery with a large amount of gasoline rather than several trips with a smaller quantity. To illustrate, Ainlay said that in a one-

month period it would take twelve and one-half hours and twenty-nine different connections to deliver the needed gasoline to the Tomah station (22,000 gallons) with the 1,500-gallon tank wagon, while the 8,000-gallon rig would be used only one hour and twenty minutes, with five connections, in accomplishing the delivery. Ainlay and Miller said that the danger is less with the larger truck because gasoline can be discharged from it into the underground tank at the station without the escape of vapors while this is not the case with the small truck which carries no airtight hoses and connections. All the witnesses agreed that the size of the tank itself had no bearing on the problem of safety, but that the real factors included proper equipment, proper training of personnel, and the filling rate. Miller could remember only one fire occurring at an unloading operation in the past thirty-six years and Pavlik could recall only one such occasion in the last forty-two years.

In addition to the actual testimony, the National Fire Protection Association handbook and the Flammable Liquids section of the Wisconsin Administrative Code were introduced into evidence. The former book contained the following statements:

"In the past many cities have attempted to minimize the fire problem by specifying the maximum sizes of tanks. The wisdom of this sort of provision is highly dubious. Assuming, for example, that it is necessary to transport 4,000 gal of gasoline over city streets to make local deliveries, a legal restriction as to maximum size of tank might require the use of four 1,000-gal tank trucks in place of one 4,000-gal tank. This multiplies by four the tank truck traffic, with four times the accident potential. The danger from a gasoline fire is not in direct proportion to the quantity of gasoline." [8]

and

". . . the greatest hazard in flammable liquid storage is in transferring the liquid to or from storage, rather

---

[8] Fire Protection Handbook (12th ed.), sec. 7–35.

than in the storage itself. The hazard of storage might seem to depend upon the quantity stored, but as a practical matter the size of the tank or container is less important than other factors, such as characteristics of the liquid stored, design of the tank, foundations and supports, size and location of vents, and related piping and connections." [9]

The Administrative Code had this recommendation:

"The normal traffic and other hazards inherent in the distribution of motor fuel and other flammable liquids by tank vehicles can be minimized by curtailing the number of trips over the streets and highways and the number of cargo tank loading and unloading operations. Restrictions limiting cargo tank capacity or the quantity that may be distributed per load tend to increase these hazards." [10]

Thus the record overwhelmingly shows that the only possible fire hazard guarded against by section 2 was the possible tipping over of the large transports with the attendant possibility of fire aboveground or in the sewerage system; that this hazard was minor as against the fire hazard created by the much greater frequency with which the smaller trucks would be on the highways unloading with much more hazardous equipment.

This is too thin a basis for legislative action. Any legislative choice in adopting the provisions of section 2 is without rational basis. Understandably, courts are loath to second-guess legislative bodies. The court has no business saying whether or not it would have acted the way the council did in making a proper legislative choice. In adjudicating the validity of the whole or any part of an ordinance, the trial court and this court examine the ordinance and the evidence presented to ascertain whether the legislative choice that the council made is absolutely without any reasonable basis. If there is room for

[9] Id. at sec. 7–11.
[10] 2 Wis. Adm. Code, sec. Ind 8.953 (9) (a), December, 1960, Register No. 60.

debate then this court, like the trial court, must validate the ordinance because a matter of legislative choice is involved which is the exclusive domain of the city council.

In our judgment there is no reasonable basis for sustaining the provisions of section 2 and, therefore, that section is unconstitutional.

The trial court found that section 1 was "unworkable" and "unreasonable." We agree. The section prohibits any parking of any gasoline-carrying vehicle "whether loaded or empty on any public street, highway or alley or open space in the City of Tomah except for the purpose of making repairs thereto." There can be no more danger attendant on the parking of an empty petroleum vehicle than an ordinary truck or automobile. Thus there is no reasonable basis for the singling out of unloaded gasoline-carrying vehicles for such parking regulations as distinguished from other types of vehicles.[11] Then too, there is grave question about what is meant by "open space." Does this mean that a gasoline-carrying vehicle is prohibited from parking in a private driveway, or does the term "open space" apply merely to public areas other than streets, highways or alleys, such as a municipal parking lot? We conclude that the ordinance is unreasonable in treating unloaded gasoline-carrying vehicles with equal strictness as those which are loaded (or partially loaded with liquid or with fumes) while not regulating the parking of other vehicles that would seem to present no less hazard than the unloaded petroleum vehicles.

Appellant argues that the restrictions against parking are to be construed with reference to the provisions of sec. 346.53, Stats.,[12] and sec. 349.13;[13] that accordingly

---

[11] *J & N Corp. v. Green Bay, supra,* footnote 3; *State ex rel. Ford Hopkins Co. v. Mayor* (1937), 226 Wis. 215, 276 N. W. 311.

[12] "346.53 PARKING PROHIBITED IN CERTAIN SPECIFIED PLACES. No person shall stop or leave any vehicle standing in any of the following places except temporarily for the purpose of and while actually engaged in loading or unloading or in receiving or dis-

the ordinance does not prohibit mere stopping but prohibits parking, which requires that the vehicle be left standing in the prohibited area and unattended for an extended period of time. This construction of the ordinance seems reasonable but does not save the ordinance from being unconstitutional on the grounds first, that the prohibition applies equally to loaded and unloaded petroleum vehicles, and second, that there is a broad prohibition against parking in open spaces without any definition of what that term embraces.

For the reasons indicated, we conclude that section 1 is unconstitutional.

The trial court made no comment about section 3 in his opinion and made no findings concerning that section. This section makes it unlawful to transfer inflammable fluids except where "authorized by applicable federal and state laws or ordinances of the city of Tomah." In view of section 5, which makes the violation of any provision of the ordinance punishable by payment of a forfeiture, the end effect of section 3 (assuming the invalidity of sections 1 and 2) is to provide a local forfeiture offense for the illegal transfer of inflammable fluids contrary to the federal and state regulations. The city of Tomah has authority under sec. 62.11, Stats., to provide for such a forfeiture offense. Therefore, the trial court erred in invalidating section 3.

Two courts in other jurisdictions have reached similar conclusions with respect to ordinances remarkably sim-

charging passengers and while the vehicle is attended by a licensed operator so that it may promptly be moved in case of an emergency or to avoid obstruction of traffic: . . ."

13 "349.13 AUTHORITY TO REGULATE THE STOPPING, STANDING OR PARKING OF VEHICLES. (1) . . . A sign indicating that stopping or standing is prohibited means that all stopping or standing is prohibited except under the circumstances described in s. 346.50 (1). A sign indicating that parking is prohibited means that parking is prohibited but that stopping temporarily for the purpose of receiving or discharging passengers or loading or unloading is not prohibited, provided the vehicle is attended by a licensed operator."

ilar to the Tomah ordinance. In South Carolina [14] an ordinance restricted delivery of petroleum products to any retail gasoline filling stations by trucks having capacity of more than 1,250 gallons and without compartments, and prohibited the parking of any vehicle, loaded or empty, used for transportation of petroleum products upon the streets of the municipality. This ordinance was held to be unreasonable and arbitrary as to both provisions.[15] In Texas an ordinance [16] prohibited the unloading of gasoline at retail establishments from a tank truck containing more than 1,500 gallons of gasoline. This ordinance was likewise held to be unconstitutional on the ground:

". . . that no greater danger of fire was inherent in the direct delivery by transport truck over the system of delivery to a storage tank and then redelivery by smaller truck to the station, . . ." [17]

*By the Court.*—Judgment modified to affirm the lower court's holding of unconstitutionality as to sections 1 and 2 of Ordinance 381, but upholding the validity of sections 3, 4, and 5 of the ordinance, and, as so modified, affirmed. No costs to be taxed on this appeal.

---

[14] *McCoy v. Town of York* (1940), 193 S. C. 390, 8 S. E. (2d) 905.

[15] Id. at page 397, 8 S. E. (2d) at 908.

[16] *Ex Parte Rodgers* (Tex. Crim. 1963), 371 S. W. (2d) 570.

[17] Id. at page 571.