STATE, Appellant, v. INTERSTATE BLOOD BANK, INC., Respondent.

*Nos. State 100–102. Submitted October 3, 1974.—Decided October 31, 1974.*
(Also reported in 222 N. W. 2d 912.)

484

For the appellant the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

For the respondent there was a brief by *Robert I. Perina, Robert D. Hoyt* and *Perina & Hoyt,* all of Madison, and oral argument by *Robert D. Hoyt.*

CONNOR T. HANSEN, J.   The defendant contends there is insufficient evidence to support the conviction. The test on appeal of the sufficiency of the evidence to sustain a conviction was recently stated in *Willis v. State* [4] as follows:

---

[4] (1973), 60 Wis. 2d 158, 162, 208 N. W. 2d 403. *See also: Strait v. State* (1969), 41 Wis. 2d 552, 559, 164 N. W. 2d 505;

". . . The test on appeal of the sufficiency of the evidence to convict is whether the 'evidence adduced, entitled to belief, and rationally considered by a jury was sufficient to prove the defendant's guilt beyond a reasonable doubt.' The test is 'not whether this court is convinced of the defendant's guilt but whether the jury acting reasonably could be so convinced.' Stating the rule conversely for the sake of clarity, the evidence ' "when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' " '. . ."

The evidentiary issue presented was whether the defendant was, a "blood bank" within the meaning of the statute. The designation "blood bank" is not defined in sec. 146.31 (1), Stats., or elsewhere in the statutes.

The following two definitions of blood bank were submitted to the jury in the instructions of the trial court. The American Association of Blood Banks (hereinafter AABB), of which the defendant is a member, defines a blood bank as an organization which performs four of the following functions: (1) Bleeding of donors, (2) donor recruiting, (3) blood processing, (4) blood storage, (5) cross-matching, (6) infusion of blood, and (7) preparation of blood components. Webster's Seventh New Collegiate Dictionary defines a blood bank as "a place for storage of or an institution storing blood or plasma; also: blood so stored."

Under the AABB definition, as applicable to this case, the jury was required to find the defendant performed the following four functions: (1) Donor recruiting, (2) donor bleeding, (3) blood processing, and (4) blood

storage.[5] The defendant stipulated to the fact they bled donors and the evidence that the defendant recruited donors was undisputed. Thus the remaining questions were whether the defendant processed and stored blood. Also, under the dictionary definitions of "blood bank" it was necessary to show that the defendant stored blood.

The evidence was undisputed that the defendant collected blood from donors throughout the day, placed it in a refrigerator for cooling, and at the end of the day shipped it to Chicago. The applicable federal regulations call this activity "temporary storage." While various experts disagreed as to whether this activity constituted storage, the question was ultimately one of fact for the jury to decide.

It is further undisputed that the defendant performed the following operations: Drew a blood sample from the donor's finger; tested it for RH factor, blood type and hemoglobin level; and ran a michrohemocrit test. On the drawing of the blood it was placed in a plastic bag and mixed with an anticoagulant, then refrigerated and ultimately sent to Chicago. The jury, as the trier of fact, could find that these activities constituted processing.

The question before the jury was whether the defendant operated a blood bank, not whether it met the test established by either the dictionary or AABB definitions. However, based upon either of these definitions as guidelines, we are of the opinion that there was sufficient evidence to sustain the jury verdict.

Since we determine there was sufficient evidence to sustain the verdict, we consider the constitutional issues raised.

The defendant carries a heavy burden if he is to prevail in his attack upon the constitutionality of sec.

---

[5] It was conceded the defendant did not engage in cross-matching, infusion of blood or the preparation of blood—the other three functions of the AABB definition.

146.31 (1), Stats. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all possible, and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality.[6] As stated in *State ex rel. Carnation Milk Products Co. v. Emery* (1922), 178 Wis. 147, 160, 189 N. W. 564:

"If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court. . . ."

Also, in *State ex rel. Carnation Milk Products Co. v. Emery, supra,* p. 152, this court quoted approvingly from Cooley, *Const. Lim.* (7th ed.), p. 236, as follows:

" '. . . The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power. . . .' "

Therefore, in order for this court to strike down an act of the legislature, it is necessary to find that it offends specific provisions of the State or United States Constitutions which have limited and circumscribed legislative action.

The defendant attacks the constitutionality of the statute on several grounds. It claims the statute is vague;

---

[6] *State ex. rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 46, 205 N. W. 2d 784; *State ex rel. Commissioners of Public Lands v. Anderson* (1973), 56 Wis. 2d 666, 672, 673, 203 N. W. 2d 84; *Chicago & N. W. Ry. v. La Follette* (1969), 43 Wis. 2d 631, 647, 169 N. W. 2d 441; *Clark Oil & Refining Corp. v. Tomah* (1966), 30 Wis. 2d 547, 553, 554, 141 N. W. 2d 299.

that it is overbroad; that it violates the defendant's rights
of due process and equal protection as an invalid exercise
of the state police power; that it is contrary to the com-
merce clause of art. I, sec. 8 of the United States Consti-
tution; and that it is contrary to the supremacy clause
of art. VI of the United States Constitution.

In the event we conclude the statute is unconstitutional
for any reason, the case is resolved, and it is not neces-
sary to consider other issues raised. *State ex rel. Bldg.
Owners v. Adamany* (1974), 64 Wis. 2d 280, 286, 219
N. W. 2d 274.

For the purpose of this opinion, it can be assumed that
the enactment of sec. 146.31 (1), Stats., is a valid exercise
of the state's police power as it relates to the due process
and equal protection rights of the defendant.

This court has held that the constitutional guarantees
of individual privileges and the restraints placed upon
the legislature by the due process and equal protection
clauses are of the same effect in both constitutions.
*Chicago & N. W. Ry. v. La Follette, supra,* page 643.

The police power of the state is the inherent power of
government to promote the general welfare. *Nebbia v.
New York* (1934), 291 U. S. 502, 524, 525, 54 Sup. Ct.
505, 78 L. Ed. 940; *Chicago & N. W. Ry. v. La Follette,
supra,* page 644. It covers all matters having a reasonable
relation to the protection of the public health, safety or
welfare. *McLean v. Arkansas* (1909), 211 U. S. 539, 29
Sup. Ct. 206, 53 L. Ed. 315; *State ex rel. Carnation Milk
Products Co. v. Emery, supra,* p. 153.

However, even though an otherwise valid enactment
pursuant to the state's police power, if it imposes an un-
reasonable or excessive burden on interstate commerce,
the statute is in violation of art. I, sec. 8 of the federal
constitution.

The interstate commerce clause has been held to
place limitations on state action in addition to the require-

ments of the due process clause. *Dean Milk Co. v. Madison* (1951), 340 U. S. 349, 71 Sup. Ct. 295, 95 L. Ed. 329. The general criteria for determining the validity of state statutes affecting interstate commerce were stated by the United States Supreme Court in *Pike v. Bruce Church, Inc.* (1970), 397 U. S. 137, 142, 90 Sup. Ct. 844, 25 L. Ed. 2d 174, as follows:

". . . Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit*, 362 U. S. 440 [443, 4 L Ed 2d 852, 80 S Ct 813, 78 ALR2d 1294]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. . . ."

Defendant contends that the statute, as applied to it, has a clearly excessive impact on interstate commerce as compared to the putative local benefits. Defendant procures approximately 1800 to 2000 units of blood monthly. Using the statistics offered by the state, this would comprise nearly eight to nine percent of all the blood collected in Wisconsin.[7] All of the defendant's blood is sold to out-of-state users and constitutes 50 to 60 percent of the blood coming into defendant's sister corporation, Interstate Blood Bank, Inc., of Chicago, and 10 to 12 percent of all the blood in the Interstate Blood Bank, Inc.,

[7] *See:* State's reply brief, pages 5 and 6. Defendant procured 1800–2000 units/mo. The Milwaukee Blood Center drew 60,000 units in 1970. The population of the state in 1970 was 4,418,083, while that of the Milwaukee area was 1,252,457. By extrapolation there would have been approximately 267,000 blood units drawn in the state in 1970 of which between 21,600 and 24,000 would be attributable to defendant's operation or eight to nine percent.

system. Further, some of the defendant's blood is sold to drug companies, whose products are, in turn, also sold in interstate commerce. Finally, defendant presented voluminous evidence which tended to show the substantial reliance on commercially obtained blood by major blood users across the country including the federal government. If the statute and conviction are upheld, it will be impossible for defendant to operate in Wisconsin and its blood will be withdrawn from interstate commerce.

The state asserts that this case is governed by the United States Supreme Court decision in *Milk Board v. Eisenberg Co.* (1939), 306 U. S. 346, 59 Sup. Ct. 528, 83 L. Ed. 752. In that case, the supreme court upheld a Pennsylvania Act regulating milk processors as it applied to a processor who sold his entire supply of milk to New York. The court pointed out that only 10 percent of the milk of Pennsylvania was shipped out of state. Thus, the local interest which was served by the regulation scheme operated in regard to 90 percent of Pennsylvania's milk production making the local interest protected of sizeable concern in comparison to the rather small effect the statute had on interstate commerce.

The *Eisenberg Case* is distinguishable from the present case, and, if anything, indicates the necessity for a different result in the instant case. First, the present statute does more than merely regulate the defendant's business; it prohibits it. Second, the present statute, unlike the one in *Eisenberg,* operates only with regard to commercial, profit oriented blood banks. Thus, there is no "comparatively large field remotely affecting and wholly unrelated to interstate commerce within which the statute operates," *Eisenberg, supra,* 353, because defendant is the only such blood bank in Wisconsin and it ships all of its blood in interstate commerce. The nonprofit blood banks may continue to operate without limitation. The statute has no field of operation except that which

directly affects and is solely related to interstate commerce. A comparison of the percentage figures of blood involved in interstate commerce in this case with those in *Eisenberg,* is therefore meaningless and misleading. Thus, while we have assumed that Wisconsin has a sufficient interest to justify the statute in due process terms, the scope of the interest is not as broad as the Pennsylvania interest in providing for the purity of virtually all of the milk sold to its citizens, and the burden on interstate commerce here is more substantial.[8]

Defendant further contends that the statute does not deal evenhandedly with intrastate and interstate blood banks. There is no merit to this contention because the statute makes no such differentiation, and, in fact, the Milwaukee Blood Center, Inc., a nonprofit blood bank, did and continues to sell some of its blood to out-of-state drug companies. Further, the statute would apply to defendant whether or not it sold its blood intrastate or interstate.

The state argues for upholding the act by citing *Sligh v. Kirkwood* (1915), 237 U. S. 52, 59, 60, 35 Sup. Ct. 501, 59 L. Ed. 835, for the proposition that the state may prescribe regulations which shall prevent the production within its borders of impure foods, unfit for use, and such articles as would spread disease and pestilence. In that case the United States Supreme Court sustained a Florida Act which made it unlawful for anyone to sell, offer for sale, ship or deliver for shipment, any citrus fruits which are immature or otherwise unfit for consumption. Unlike the present case, the state's interest in *Sligh* was substantial in that Florida sought to protect the state's reputation in foreign markets for its major industry. On balance, the supreme court felt that the

---

[8] *Cf. Lemke v. Farmers Grain Co.* (1922), 258 U. S. 50, 42 Sup. Ct. 244, 66 L. Ed. 458 (State's interest in grading grain quality is relatively small where most of the state's grain is sold to other states and most of the defendant's grain is sold in interstate commerce.).

burden on interstate commerce was merely incidental and sustained the act.

Defendant contends that the Wisconsin statute is in direct conflict with certain federal statutes licensing and regulating blood banks and, therefore, the state statute must yield to the federal act.[9] It is conceded by the state that the purpose of these federal provisions is to regulate and insure the continued safety, purity and potency of the products concerned. Defendant was operating in Wisconsin under a federal license issued to its sister corporation, Interstate Blood Bank, Inc., of Chicago, pursuant to these provisions. The effect of the Wisconsin statute is to deny defendant the privilege of operating in the state even though it is federally licensed to do so. The presumed purpose of the Wisconsin statute is the same as the express purpose of the federal statute.

The relationship between the federal government and the state governments in the area of interstate commerce was summarized in *Milk Board v. Eisenberg Co., supra,* page 351, as follows:

". . . The United States could not exist as a nation if each of them were to have the power to forbid imports from another state, *to sanction the rights of citizens to transport their goods interstate,* or to discriminate as between neighboring states in admitting articles produced therein. The grant of the power of regulation to the Congress necessarily implies the subordination of the states to that power. This court has repeatedly declared that the grant established the immunity of interstate commerce from the control of the states respecting all those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regu-

---

[9] *See:* 42 USCA, p. 185, sec. 262 *(Regulation of biological products—Intrastate and interstate traffic; suspension or revocation of license as affecting prior sales);* 21 USCA, p. 413, sec. 360 *(Registration of drug producers—Definitions);* U. S. Public Health Service Regulations, 42 C. F. R., secs. 73 and 74.10 (e) (2) (i), (1968).

lation must be prescribed by a single authority. But in matters requiring diversity of treatment according to the special requirements of local conditions, *the states remain free to act within their respective jurisdictions until Congress sees fit to act in the exercise of its overriding authority. . . ."* (Emphasis added.) [10]

The question of how much latitude remains in the state to regulate a federally licensed industry has received much attention in recent cases of the United States Supreme Court. In *Huron Cement Co. v. Detroit, supra,* it was determined that Detroit could constitutionally enforce its smoke abatement code even if it required ships to undergo structural alterations in order to comply and even though the ship's boilers and equipment were federally inspected as a prerequisite for federal licensure. The supreme court noted that the federal requirements related solely to the safety of the equipment and were not intended to preempt more stringent requirements based on environmental considerations. The supreme court specifically found that there was no overlap between the federal and Detroit requirements, and that Detroit was neither requiring a local occupation license in addition to the federally granted license, nor excluding a federally licensed vessel from its port. In *Sperry v. Florida* (1963), 373 U. S. 379, 83 Sup. Ct. 1322, 10 L. Ed. 2d 428, the supreme court concluded that the state of Florida could not require that a person be a member of the Florida Bar as a prerequisite to conducting a practice from that state before the United States Patent Office where federal law permitted a nonlawyer to be licensed for certain

[10] *See also: Florida Avocado Growers v. Paul* (1963), 373 U. S. 132, 83 Sup. Ct. 1210, 10 L. Ed. 2d 248, rehearing denied, 374 U. S. 858, 83 Sup. Ct. 1861, 10 L. Ed. 2d 1082; *Huron Cement Co. v. Detroit* (1960), 362 U. S. 440, 80 Sup. Ct. 813, 4 L. Ed. 2d 852; *Bedno v. Fast* (1959), 6 Wis. 2d 471, 95 N. W. 2d 396; *Metropolitan Finance Corp. v. Matthews* (1953), 265 Wis. 275, 61 N. W. 2d 502.

types of patent practice. The supreme court stated in *Sperry v. Florida, supra,* at page 385:

". . . A State may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress. 'No State law can hinder or obstruct the free use of a license granted under an act of Congress.' *Pennsylvania v. Wheeling & B. Bridge Co.* 13 How. 518, 566 [14 L Ed. 249, 269]."

The principle that a state may not impose stricter standards of occupational licensing on federally licensed occupations was affirmed in the analogous case of *Florida Avocado Growers v. Paul, supra.* The precise question involved in that case was whether the state of California could impose different, and in some ways more stringent requirements than the federal authorities in reaching a determination that avocadoes were not sufficiently fit for sale. The federal requirements were held to govern the standards applicable to avocadoes before they entered the stream of interstate commerce, while the California requirements were aimed at determining the fitness of avocadoes for sale within the state. The supreme court emphasized that the California statute did not totally exclude the federally regulated fruit and distinguished between the right of California to regulate in the area and the right of the sending state, Florida, to so regulate:

". . . Thus, while Florida may perhaps not prevent the exportation of federally certified fruit by superimposing a higher maturity standard, nothing . . . forbids California to regulate their marketing." *Florida Avocado Growers v. Paul, supra,* page 145.

The principle enunciated in the above cases is that when the federal government has undertaken a compre-

hensive regulatory and licensing system of an occupation engaged in interstate commerce for a particular purpose, *i.e.*, to insure the safety, potency, and purity of a particular product, the states are pre-empted from prohibiting the same occupation as a means of accomplishing the same purposes. Where such a direct conflict between the federal and state law exists, the normal inquiry as to whether the intent to pre-empt is clearly manifested [11] is not applicable.[12] This is not a case, as the state would suggest, where Congress has not acted, or where it has acted but has circumscribed or limited its area of concern. Cases cited by the state which have dealt with the permissible scope of state action under such circumstances are, therefore, not in point.[13]

Defendant further asserts that even if there is no direct conflict with the federal licensing procedures the statute is in conflict with an implied uniform federal policy favoring the continuation of commercial blood banks and Wisconsin, therefore, is pre-empted from regulating the subject. This court in *Walker Mfg. Co. v. Industrial Comm.* (1965), 27 Wis. 2d 669, 680, 135 N. W. 2d 307, stated the applicable test as:

". . . whether enforcement of the state act would frustrate the objectives of the particular federal act which allegedly has pre-empted the field. . . ."

[11] *See: e.g., Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. 2d 505, 135 N. W. 2d 269.

[12] *Florida Avocado Growers v. Paul, supra,* pages 142, 143: "A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce." *Sperry v. Florida, supra; Huron Cement Co. v. Detroit, supra.*

[13] The state relies generally on the following cases: *Chapman Co. v. Service Broadcasting Corp.* (1971), 52 Wis. 2d 32, 187 N. W. 2d 794; *Chicago & N. W. R. Co. v. La Follette* (1965), 27 Wis. 2d, *supra; Bedno v. Fast, supra; Day-Bergwall Co. v. State* (1926), 190 Wis. 8, 207 N. W. 959.

In support of its position, defendant points to 24 USCA, p. 115, sec. 30, which authorizes federal institutions to pay donors for their blood and to sec. 301 of P. L. 87–781, relating to 21 USCA, pp. 413–415, sec. 360, which declares the Congressional finding that licensing, inspection and regulation of drug establishments engaged in either interstate or solely intrastate commerce is necessary to make such regulation effective. The experts who testified at the hearing, while not in agreement as to whether a wholly voluntary donor system could eventually fulfill the nation's blood needs, or the reasons for any current shortage of blood, were nearly unanimous as to the present inadequacy of the supply of blood absent that generated by paid donors.

In summation, the state's interest in promoting the public health in those few instances where the federal requirements would not adequately prevent a donor from making too frequent donations and where a Wisconsin resident might be a recipient of defendant's blood even though it is now sold entirely outside the state, while presumably sufficient to sustain the act in a due process sense, is not of sufficient magnitude to justify the substantial burden placed on interstate commerce. In addition, the statute prohibits defendant from engaging in an occupation for which it is federally licensed and thus, under the circumstances of this case, there is a direct conflict between the state and federal laws to which the former must yield under the doctrine of pre-emption and the supremacy clause of the United States Constitution.

This statute does not prevent or regulate any Wisconsin hospital or institution in the purchasing of out-of-state blood obtained by commercial blood banks. If the primary evil of commercial blood banks is the purchase and use of their product, this statute does not regulate or stop it. Thus, the putative local benefit of the act is, at

best, minimal, and certainly in gross disproportion to the substantial burden on interstate commerce.

Sec. 146.31 (1), Stats., is declared to be unconstitutional as being in violation of the commerce clause, art. I, sec. 8, and the supremacy clause, art. VI, of the United States Constitution.

*By the Court.*—Order affirmed.