COFFEE-RICH, INC., and another, Respondents, v.
DEPARTMENT OF AGRICULTURE and another, Appellants.

*No. 72 (1974). Argued October 1, 1975.—Decided
October 28, 1975.*
(Also reported in 234 N. W. 2d 270.)

For the appellants the cause was argued by *Theodore L. Priebe,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general, and *Linda M. Clifford,* assistant attorney general, of counsel.

For the respondents there was a brief by *Robert J. Kay* and *Geisler & Kay,* attorneys, all of Madison, and *Ellis G. Arnall, Elliott M. Levitas, John C. Gray* and *Arnall, Golden & Gregory* of counsel, all of Atlanta, Georgia, and oral argument by *Robert J. Kay* and *Ellis G. Arnall.*

WILKIE, C. J. This appeal involves the constitutionality of sec. 97.48 (4), Stats., enacted as part of the Laws of 1971, ch. 212, which law prohibits the "sale or serving of any product for use as a coffee cream or whitener in any restaurant or public eating establishment, other than cream, half and half or lighter varieties of cream" and further provides:

". . . This subsection shall not apply to coffee whitener sold or dispensed by a vending machine provided such machine bears a prominently affixed label or legend stating that the coffee whitener sold or dispensed is not a dairy product or is an imitation dairy product."

We affirm the trial court in holding ch. 212 unconstitutional.

Plaintiff-respondent Coffee-Rich, Inc., is a Delaware corporation with its principal place of business in Buffalo, New York. It exports and sells in Wisconsin its product known as Coffee-Rich. Coffee-Rich is a nondairy creamer used mainly as a whitener in coffee and tea, but also used on breakfast cereals, fruits, and desserts. It is sold for resale at supermarkets and other retail stores, and is also sold to restaurants and institutional users like hospitals and schools. It comes in retail pint cartons, and in quart cartons, which is the form most commonly used by restaurants. It is also available

in one-half ounce containers of liquid and in three-gram packages of powder, both of which are carefully labeled.

Coffee-Rich differs from cream in that it consists of vegetable-derived ingredients, rather than of animal fats. It is a wholesome, nutritious food. In content it is a product sui generis, and not merely an imitation of cow's cream. However, it is, for all practical purposes, indistinguishable to the average person when mixed with and served in coffee. Compared to cream and cream derivatives, Coffee-Rich enjoys advantages in terms of resistance to spoilage, price, storability, and less tendency to "feather" or "oil off" in coffee and tea.

Plaintiff-respondent Crandall's Restaurant, Inc., is located in Madison, Wisconsin, and has been serving Coffee-Rich to its patrons for seven years, both as a creamer for coffee and tea and for use on cereals, fruits, and desserts. The record does not show the form in which Crandall's serves Coffee-Rich. However, since sales to restaurants are commonly in quart containers, a substantial part of this service must either be by direct mixing with coffee in the kitchen or at a service stand or through the provision of unlabeled pitchers of Coffee-Rich.

After receiving notice by mail from the secretary of agriculture that it was in violation of sec. 97.48 (4), Stats., Crandall's began an action on April 12, 1972, to enjoin the Wisconsin Department of Agriculture from enforcing this statute. The state appeals from the court's order granting a permanent injunction against enforcement of ch. 212.

The sole issue on this appeal is whether sec. 97.48 (4), Stats., is unconstitutional because either (1) it is a deprivation of due process; or (2) it is a burden on interstate commerce. We conclude that this statute is not an unconstitutional deprivation of due process but that it does constitute an excessive burden on interstate commerce in violation of art. I, sec. 8 of the federal constitution.

*Presumption of constitutionality of legislation.*

Every legislative enactment which regulates economic activity, and does not infringe upon fundamental freedoms, enjoys a strong presumption of constitutionality, and one who seeks to overcome this presumption must bear the heavy burden of proving beyond a reasonable doubt that the statute in question is unconstitutional.[1] Not only is the burden of the challenger heavy in this regard, but the task of this court in passing upon the constitutionality of laws is limited and restrained. This court does not sit as a superlegislature debating and deciding upon the relative merits of legislation. It looks for a reasonable basis upon which the legislature might have acted, and assumes that the legislature had such a purpose in mind when it enacted the law in question.[2]

*Purpose to prevent consumer deception.*

Prevention of consumer confusion and deception is the reasonable basis advanced by the attorney general in support of the law. He argues that, since Crandall's has been serving Coffee-Rich directly mixed with coffee or in unlabeled pitchers for seven years, consumers have been misled into thinking they were getting real cream or some derivative thereof. Instead of "coffee with cream" as they presumably requested, they received a blend of water, vegetable fat, corn syrup solids, vegetable protein,

[1] *State v. Interstate Blood Bank, Inc.* (1974), 65 Wis. 2d 482, 488, 489, 222 N. W. 2d 912; *State ex rel. Hammermill Paper Co. v. La Plante* (1973), 58 Wis. 2d 32, 46, 205 N. W. 2d 784; *Chicago & N. W. Ry. v. La Follette* (1969), 43 Wis. 2d 631, 645–647, 169 N. W. 2d 441; *Clark Oil & Refining Corp. v. Tomah* (1966), 30 Wis. 2d 547, 553, 141 N. W. 2d 299.

[2] *State v. Interstate Blood Bank, Inc.*, *supra*, footnote 1, at page 489; *Chicago & N. W. Ry. v. La Follette*, *supra*, footnote 1, at page 648; *White House Milk Co. v. Reynolds* (1960), 12 Wis. 2d 143, 106 N. W. 2d 441; *see also: North Dakota Pharmacy Board v. Snyder's Stores* (1973), 414 U. S. 156, 164–166, 94 Sup. Ct. 407, 38 L. Ed. 2d 379.

polyglycerol esters of fatty acids, polysorbate 60, dipo-
tassium phosphate, disodium phosphate, carrageenan, and
beta-carotene. The attorney general argues that the legis-
lature could reasonably believe that this factual situation
exists, and that it forms a reasonable basis upon which
the legislature could act. Thus, the attorney general as-
serts that the purpose of the legislation was not to protect
the state's dairy industry, but to prevent fraud and de-
ception in the sale and service of coffee with cream in
restaurants.

In a line of cases this court has consistently concluded
that the legislature could constitutionally enact legisla-
tion with such a purpose of preventing fraud and decep-
tion in the sale of products.

Nearly fifty years ago, in *Day-Bergwall Co. v. State*,[3]
this court recognized that consumers might be confused
by the sale of an imitation vanilla product, and that the
legislature could act upon the factual basis to protect the
public from fraud. A few years earlier, in *Hebe Co. v.
Shaw*,[4] the United States Supreme Court found that the
circumstances of sale of evaporated milk created a risk
of fraudulent substitution for whole milk, and that this
danger was a sufficient factual basis for an outright
prohibition on the sale of evaporated milk. In 1944, the
supreme court also decided, in *Carolene Products Co. v.
United States*,[5] that the likelihood of confusion, decep-
tion, and substitution in the sale of filled milk products
was enough to sustain constitutionality of the federal
Filled Milk Act.

Although these cases are from an earlier era, there is
today an even greater concern for protection of consumer

---

[3] (1926), 190 Wis. 8, 14, 207 N. W. 959.

[4] (1919), 248 U. S. 297, 39 Sup. Ct. 125, 63 L. Ed. 255.

[5] (1944), 323 U. S. 18, 65 Sup. Ct. 1, 89 L. Ed. 15. In *Milnot
Co. v. Richardson* (D. C. Ill. 1972), 350 Fed. Supp. 221, a
federal district court concluded that changed circumstances of
sale and unequal enforcement of the Filled Milk Act required the
conclusion that the act was unconstitutional as applied to the
plaintiff.

rights, which reasonably includes the right to be served what one expects in a public restaurant. This concern has been reflected in more recent cases involving the deceptive sale of new foods closely resembling other foods. For example, in *Aeration Processes, Inc. v. Commissioner of Public Health*,[6] the Massachusetts Supreme Court was faced with a product called Instantblend, which was a nondairy creamer similar to Coffee-Rich. In that case the court found that there was a substantial risk of consumer mistake and deception in the sale of a product so similar to cream. This danger was even greater in light of the fact that Instantblend was being served at restaurants and other public eating establishments. The court conceded that the intent of the manufacturer of this product might have been to make an entirely new product, but pointed out that this was not inconsistent with the intent to make that new product resemble cream, and that this innovative intent, however laudable, was irrelevant to the question of whether there was confusion and mistake among consumers. The court concluded that a total prohibition upon the sale of Instantblend did not constitute an unconstitutional deprivation of due process. In *Coffee-Rich, Inc. v. Commissioner of Public Health*,[7] the Massachusetts Supreme Court had before it a similar case involving the sale of Coffee-Rich. The holding of that case was that a total prohibition in the sale of Coffee-Rich was constitutionally unjustified because the evidence showed that most of the sales were made from the frozen foods sections of supermarkets, and thus there was less risk of consumer mistake and deception than there might be in other circumstances. *Aeration Processes*, with its reasoning about a higher risk of deception in restaurant sales, was not overruled, as plaintiffs suggest. On the contrary, the court found that Coffee-Rich was indistinguishable from cream in coffee,

---

6 (1963), 346 Mass. 546, 194 N. E. 2d 838.

7 (1965), 348 Mass. 414, 204 N. E. 2d 281.

and that the danger of consumer confusion was present, although it was not substantial in the context of super-market sales.

Plaintiffs argue that there is no factual basis to support this law because the secretary of agriculture has never received a consumer complaint about service of Coffee-Rich in restaurants. Yet consumers can hardly be said to be aware of the deception given the fact that Coffee-Rich is indistinguishable from cream when mixed with coffee, and the fact that it is frequently so mixed out of the sight of the consumer. Even if restaurant patrons were aware of the substitution, this is hardly a matter which would provoke them to complain to the proper authorities. It is rather the cumulative effect of this deceptive substitution which may be said to have triggered the action of the legislature.

We conclude that the basic purpose of preventing deception is an underlying and constitutional purpose of the legislation.

The trial court brushed aside this claim that prevention of deception was the purpose of the legislation. Instead, it examined the legislative history of sec. 97.48 (4), Stats., and found therein a clear intent to ban Coffee-Rich because it was a nondairy product, and its continued sale presumably threatened the dairy industry of this state. In doing so, the trial court below relied upon *John F. Jelke Co. v. Emery*,[3] where it was said that this court will look to the real and not merely the professed intent of the legislature, and will relieve parties from oppressive laws, where the real purpose is not protection of the public welfare. In that case, however, the claim that prevention of deception was the aim was a sham, because uncolored oleo did not resemble dairy butter at all. Also, the state frankly conceded that promotion of the state dairy industry was one of the real ends of the legislation. In the instant case, on the other hand, deception is likely because Coffee-Rich is indistin-

---

[3] (1927), 193 Wis. 311, 323, 214 N. W. 369.

guishable from cream when mixed with coffee, and the attorney general vigorously denies any legislative intent to aid the local dairy industry.

As for the legislative history of this law, we find nothing therein which contradicts an intent to prevent deception. The original bill introduced on February 22, 1971, was Assembly Bill 340, and it banned all sale or service of nondairy whiteners in restaurants. Assembly Amendment I, introduced on April 20, 1971, is thoroughly consistent with a purpose to prevent deception, and contrary to an intent to suppress competition, because it allowed dispensation of nondairy whiteners in all vending machines bearing a prominent legend stating that the whitener dispensed therefrom was not a dairy product. Senate Amendment I, introduced on July 15, 1971, would have allowed sale and service of nondairy whiteners to customers who specifically requested them, but this amendment was defeated. Yet the defeat of this amendment indicates only that the legislature rejected an opportunity to employ a narrower means of achieving its end of preventing deception. The trial court believed that the legislature had no purpose of preventing deception in mind when it passed sec. 97.48 (4), Stats. This legislative history does not support that belief. The legislature did intend to prevent deception in the sale of nondairy products.

### Means rationally related to end.

To be constitutional, a reasonable legislative purpose must also be accomplished by means which are consistent with due process. This does not mean that the legislature must choose the least restrictive alternative in carrying out its intent. The requirement is that " 'the means selected shall have a real and substantial relation to the object sought to be attained.' "[9]

---

[9] *Chicago & N. W. Ry. v. La Follette* (1965), 27 Wis. 2d 505, 521, 135 N. W. 2d 269; *Nebbia v. New York* (1934), 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940.

Here it should be noted that the legislature has not chosen the drastic means of totally prohibiting the sale of Coffee-Rich. In *Coffee-Rich, Inc. v. McDowell*,[10] this court affirmed, by an equally divided vote, a lower court decision declaring unconstitutional a prior attempt to ban totally the sale of nondairy whiteners like Coffee-Rich. Similarly, in *Dairy Queen of Wisconsin, Inc. v. McDowell*,[11] this court rejected an attempt to forbid totally the sale of Dairy Queen products on the ground that they were misleading imitations of ice cream. Finally, in *John F. Jelke Co. v. Emery*,[12] the court declared unconstitutional a law which completely prohibited the sale of uncolored oleomargarine on the ground that it was a misleading butter substitution.

The enactment now in question is only a partial prohibition (although an important part) of the sale and service of nondairy whiteners, and is thus qualitatively unlike those prior enactments struck down by this court. Coffee-Rich can still be sold by retail stores and used by institutions like schools and hospitals. Indeed, Coffee-Rich has stipulated that it makes substantial sales of this kind in Wisconsin.

More importantly, the legislature has prohibited sales only in the restaurant setting, where deception is most likely to occur. The legislature reasonably did not prohibit retail sales of Coffee-Rich in those cases where the product is sold at retail in properly labeled containers, which shoppers are in the habit of perusing as they make their conscious buying choices. Likewise, dispensation of Coffee-Rich through vending machines is also allowed, provided the machine bears a prominent label informing the purchaser that Coffee-Rich, and not some type of cream, is being sold. Once again, the legislature could reasonably have found that a person reads the informa-

[10] (1964), 25 Wis. 2d 99, 130 N. W. 2d 203.
[11] (1952), 260 Wis. 471, 51 N. W. 2d 34, 52 N. W. 2d 791.
[12] (1927), 193 Wis. 311, 214 N. W. 369.

tion posted on a vending machine before he makes his choice. In the restaurant setting, however, the legislature reasonably took notice of the fact that coffee is often whitened out of the presence of the patron, and without asking him whether he objects to substitution of a non-dairy whitener for cream. In this context the opportunity for conscious consumer choice is substantially reduced, and the opportunity for deceptive substitution greatly increases. It can be assumed that the legislature imposed its partial prohibition in regard to restaurant sales specifically because of this different factual situation. This choice of means is therefore rationally and substantially related to the end in view. Prohibition of restaurant sale and service will prevent consumer deception where it is most likely to occur.

### Excessive burden on interstate commerce.

The difficulty with the provisions of ch. 212, Laws of 1971, which leads us to conclude that the enactment is unconstitutional is the excessive burden it places on interstate commerce.

The trial court relied upon *Dean Milk Co. v. Madison*[13] for its conclusion that this statute is unconstitutional in this respect. At issue in that case was a Madison city ordinance which (1) prohibited the sale of pasteurized milk unless the milk was pasteurized at an approved plant within five miles of the central square, and (2) forbade the sale of milk without a permit, but imposed no duty upon city inspectors to go more than 25 miles from Madison in their inspections prior to issuing permits. The United States Supreme Court found that the practical effect of this ordinance was to exclude out-of-state milk, as well as milk produced in other areas of Wisconsin not in close proximity to Madison. The court concluded that the ordinance constituted a clear dis-

[13] (1951), 340 U. S. 349, 71 Sup. Ct. 295, 95 L. Ed. 329.

crimination against interstate commerce, which the city of Madison was not free to impose "if reasonable non-discriminatory alternatives, adequate to conserve legitimate local interests, are available."[14]  Reasonable alternatives did exist, in the opinion of the court, because the city could either send its inspectors to examine more remote plants, at the expense of the company that owned the plant, or rely upon the federal grading and inspection system, which was trustworthy and accurate.

*Pike v. Bruce Church, Inc.*[15] is a more recent case which sets forth the factors appropriate to a determination of whether a state action unduly burdens interstate commerce.  In that case an Arizona agricultural official had ordered a grower of cantaloupes to cease transporting uncrated cantaloupes from Arizona to California for processing.  This authority derived from a law which prohibited the exportation of produce not packaged in standard containers.  The purpose of the law was to prevent the exportation of inferior or deceptively packaged produce, and to protect the reputation of Arizona produce growers.  In deciding that the order unduly burdened interstate commerce, the court announced the following test for such cases:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: *Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.* . . . If a legitimate local purpose is found, then the question becomes one of degree.  And the extent

---

[14] *Dean Milk Co. v. Madison, supra,* footnote 13, at page 354.

[15] (1970), 397 U. S. 137, 90 Sup. Ct. 844, 25 L. Ed. 2d 174. *See also: State v. Interstate Blood Bank, Inc.* (1974), 65 Wis. 2d 482, 222 N. W. 2d 912.

of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." (Emphasis ours.) [16]

Thus *Pike* applied a balancing approach in deciding whether the particular state action or statute offended against the commerce clause. The nature and importance of the local benefit was weighed against the amount and extent of burden which it imposed upon interstate commerce. Additionally, the court balanced the presence or absence of other reasonable means of achieving the same objective with less impact on interstate commerce.

In this case, the prevention of consumer deception is a legitimate state interest which is achieved by sec. 97.48 (4), Stats., by eliminating the misleading and fraudulent practice of substituting Coffee-Rich for cream without the knowledge or assent of the consumer, and then serving this concoction as "coffee with cream." However, we conclude that the burden imposed upon interstate commerce is clearly excessive in relation to the putative local benefits. Sec. 97.48 (4) effectively cuts off restaurant sales by firms operating in interstate commerce like Coffee-Rich, Inc. In 1971, the last year for which complete figures are available, Coffee-Rich, Inc., had a total dollar volume of Wisconsin sales to public eating establishments and institutions of $201,000. This figure represents sales of Coffee-Rich in frozen form alone, and does not include Wisconsin sales in powdered form. However, since the figure of $201,000 does include institutional users like hospitals and schools, the total dollar volume for restaurants and public eating establishments is somewhat less. Yet, according to the stipulated facts, Coffee-Rich is one of only seven nondairy creamers sold to and served in Wisconsin restaurants. Fairmont Foods, Sealtest, Borden, and Carnation are among the major food companies which market nondairy creamers

---

[16] *Pike v. Bruce Church, Inc., supra,* footnote 15, at page 142.

to public eating establishments and other institutions in Wisconsin. Thus, the total dollar volume of sales which would be completely cut off by enforcement of this statute is substantial.

There are reasonable alternatives to this statute which would have considerably less impact on interstate commerce, and still fully prevent the deception with which the legislature is legitimately concerned. The statute is a total bar to restaurant sale or service of Coffee-Rich. But a customer who specifically requests a nondairy creamer would not be misled or deceived, and yet such a customer falls within the prohibition of the statute, no matter how justifiable his preference for nondairy creamers might be from a medical, dietary, or personal point of view. Moreover, it is undisputed that Coffee-Rich comes in half-ounce containers of liquid and three-gram packets of powder. Both the containers and packets bear a clear, legible label which reads:

"Non-Dairy Creamer (Product) Contains No Milk or Milk Fat." Yet the statute forbids placement of these containers on restaurant tables, and service to consumers, who could otherwise pick them up, read them, and make a conscious choice to use them. In effect, the statute, under the guise of consumer protection, actually limits the range of wholesome, nutritious foods which the restaurant consumer may consciously choose.

In a similar fashion, the statute also prohibits restaurant sale or service even if a clip is attached to the menu, stating in reasonably prominent letters that the coffee whitener served in the restaurant is not a dairy product. The statute thus limits restaurant owners to service of cream or cream derivatives as coffee whiteners, even though a product like Coffee-Rich might be more desirable from the point of view of cost or restaurant management.

The state seeks to avoid the impact of these reasonable alternatives by citing cases which contain statements

undercutting the effectiveness of labeling as a means of informing the consumer.[17] These statements are unpersuasive in that they do not recognize the consumer's increased awareness of and interest in what he is consuming. They are also unpersuasive in the factual setting of this case. Sec. 97.48 (4), Stats., explicitly recognizes the effectiveness of labeling in the vending-machine exception to the law. How then can it be said that labeling is an unreasonable and unacceptable means of preventing deception in the restaurant setting? There is no difference in the situation of a consumer who reads a menu clip or a label on a container or packet on a restaurant table and the situation of a consumer who looks at a vending machine before making his choice. Labeling is incontrovertibly a reasonable and effective means of preventing the consumer deception in restaurants with which the legislature is rightfully concerned.

On balance we conclude that the burden which sec. 97.48 (4), Stats., imposes upon interstate commerce is clearly excessive in relation to the putative local benefits to be derived from the statute, especially since those same benefits can be fully achieved by methods less burdensome to interstate commerce.

*By the Court.*—Order affirmed.

---

[17] *Hebe Co. v. Shaw* (1919), 248 U. S. 297, 303, 39 Sup. Ct. 125, 63 L. Ed. 255; *Security Administrator v. Quaker Oats Co.* (1943), 318 U. S. 218, 230, 63 Sup. Ct. 589, 87 L. Ed. 724; *Aeration Processes, Inc., supra,* footnote 6, at page 844.