GARY I. GATES, Secretary Department of Employe Trust Funds
On behalf of the Employe Trust Funds Board (ETFB), you request my opinion on several questions concerning the board's authority to set employe and employer contribution rates for Wisconsin retirement system purposes. These percentages of payroll contributions plus investment earnings provide the assets to fund the retirement benefits provided by the system. The ETFB, an administrative agency created by the Legislature, has only those powers which are expressly conferred or necessarily implied by the statutes under which the agency operates. Kimberly-ClarkCorp. v. Public Service Comm., 110 Wis.2d 455, 461-62,329 N.W.2d 143 (1983).
Employe retirement contributions are established by state statute as a percentage of each payment of earnings. Section40.05, Stats., provides in part:
 (1) EMPLOYE RETIREMENT CONTRIBUTIONS. For Wisconsin retirement system purposes employe contributions on earnings for service credited as creditable service shall be made as follows:
(a) Except as provided in par. (b) and sub. (2n): *Page 102 
 1. For each participating employe not otherwise specified, 5% of each payment of earnings. [general employe]
 2. For each participating employe whose formula rate is determined under s. 40.23(2m)(e)2, 5.5% of each payment of earnings. [elected and executive]
 3. For each participating employe whose formula rate is determined under s. 40.23(2m)(e)3, 6% of each payment of earnings. [protective]
 4. For each participating employe whose formula rate is determined under s. 40.23(2m)(e)4, 8% of each payment of earnings. [firefighters]
. . . .
 (b) In lieu of employe payment, the employer may pay all or part of the contributions required by par. (a), but all the payments shall be available for benefit purposes to the same extent as required contributions deducted from earnings of the participating employes.
. . . .
 (2m) BENEFIT ADJUSTMENT CONTRIBUTION. Except as provided in sub. (2n), in addition to the amounts under subs. (1) and (2), a benefit adjustment contribution equal to 1% of earnings shall be paid by or for participating employes whose formula rate is determined under s. 40.23(2m)(e)1 and 3. This contribution shall be deducted from each payment of earnings to participating employes unless the employer provides through its compensation provisions or agreements that all or part of the contribution will be paid by the employer. For benefit purposes, this contribution shall be treated as if it were an employer required contribution regardless of whether the employer or the employe pays the contribution.
While employe contributions differ depending upon employe category (general, elected and executive, protective, firefighter), *Page 103 
only the general category, the largest group, will be considered in this opinion since that is the group which is the basis for the Wisconsin Education Association Council (WEAC) request which caused your opinion request. Caution is suggested, however, in light of your statement, on page one of your letter, that "whatever answers are given will be applied to all four categories." This opinion does not address any possible differences that theoretically could arise, between employment categories, in the application of section 40.05(2n) because the elected/executive and firefighter employe groups are not required to make the one percent benefit adjustment contribution.
The general employe retirement contribution thus established by section 40.05 consists of the basic five percent at subsection (1)(a)1., plus the one percent benefit adjustment contribution of subsection (2m) plus or minus any contribution rate adjustment required by subsection (2n).
Employer retirement contributions are established by state statute as the percentage of earnings necessary to fund the promised future retirement benefits after deducting the amounts generated from the employe required and benefit adjustment contributions.
Section 40.05(2) provides in part:
 EMPLOYER RETIREMENT CONTRIBUTIONS. For Wisconsin retirement system purposes:
 (a) Each participating employer shall make contributions for current service determined as a percentage of the earnings of each participating employe, determined as though all employes of all participating employers were employes of a single employer, but with a separate percentage rate determined for the employe occupational categories specified under s. 40.23(2m). A separate percentage shall also be determined for subcategories within each category determined by the department to be necessary for equity among employers. *Page 104 
 (am) The percentage of earnings under par. (a) shall be determined on the basis of the information available at the time the determinations are made and on the assumptions the actuary recommends and the board approves by dividing the amount determined by subtracting from the then present value of all future benefits to be paid or purchased from the employer accumulation reserve on behalf of the then participants the amount then credited to the reserve for the benefit of the members and the present value of future unfunded prior service liability contributions of the employers under par. (b) by the present value of the prospective future compensation of all participants.
. . . .
 (c) The percentage rates determined under this subsection shall become effective as of the beginning of the calendar year to which they are applicable and shall remain in effect during the calendar year, except that the secretary, upon the written certification of the actuary, may change any percentage determined under par. (b) during any calendar year for the purpose of reflecting any reduced obligation which results from any payment of advance contributions.
Section 40.03(5)(b) requires that the actuary:
 Shall make a general investigation at least once every 3 years of the experience of the Wisconsin retirement system relating to mortality, disability, retirement, separation, interest, employe earnings rates and of any other factors deemed pertinent and to certify, as a result of each investigation, the actuarial assumptions to be used for computing employer contribution rates, the assumed rate and the tables to be used for computing annuities and benefits. . . . *Page 105 
Based upon the recommendations of the actuary, the ETFB is authorized by section 40.03(1)(e) to "approve the contribution rates and actuarial assumptions determined by the actuary. . . ."
The actuarial recommendations adopted by the ETFB that are the subject of the questions you ask are described on pages 1-2 of your letter where you state:
 One recommendation in the Actuarial Valuation was to adjust the future investment earnings assumption from 7.5 to 7.8 percent. Another recommendation was to increase the contribution rate for "normal cost" (current service) by .2 percent of payroll effective January 1, 1991. Relying upon Section 40.05(2n), which became effective on May 19, 1989, the Board determined that the adjustment was to be apportioned as directed, half to the employer rates under sub. (2)(a) and (am) and half to benefit adjustment contributions (paid by employes) under sub. (2m).
 The actuary noted in his report that the principal cause of the proposed adjustment in contribution rates for 1991 was the provision to the actuary of corrected creditable service figures which increased participant service by an average of about one year. He further reported and the Department confirmed that the extra year of service had always been recorded on Department records but that the Department had not reported the additional service to the actuary beginning with the 1986 valuation year due to a computer programming error. The Department and consulting actuary were not aware of the reporting problem due to the concurrent merging of data bases for what had been three predecessor retirement systems.
Your questions thus relate to the increase to the 1991 contribution rate of .2 percent of payroll which increase the ETFB apportioned half to employer rates and half to benefit adjustment contributions. I have altered the order of your questions to provide better continuity in answering. *Page 106 
You ask:
 [D]oes Section 40.05(2n) apply or rather may the Board determine that only Section 40.05(2)(a) applies. . . .
Section 40.05(2)(a) establishes employer contributions as the percentage of earnings necessary to fund the retirement benefit after deducting the amount generated by employe-required and benefit-adjustment contributions. Section 40.05(2n) additionally provides that any required increase in employer contributions (not caused by benefit improvements under 1989 Wisconsin Act 13) or decrease be shared equally between employer and employe contributions. Section 40.05(2n) states:
 CONTRIBUTION RATE ADJUSTMENT. (a) If the board, on the advice of the actuary, determines that an increase or decrease in contribution rates is necessary for any annual period after 1989, the board, on the advice of the actuary, shall adjust contribution rates in the following manner:
 1. One-half of the increase or decrease in contribution rates shall be provided for by an increase or decrease in employer contributions under sub. (2)(a) and (am), except as provided in subd. 3.
 2. One-half of the increase or decrease in contribution rates shall be provided for by an increase or decrease in benefit adjustment contributions under sub. (2m), except as provided in subd. 3 or par. (b).
 3. Any increase in contribution rates required after 1989 that results from benefit improvements under 1989 Wisconsin Act 13, which would otherwise increase employer contribution rates over the 1989 rate shall be provided for by an increase in benefit adjustment contributions under sub. (2m). Notwithstanding sub. (2m), an employer may not pay for all or part of any increase in benefit adjustment contributions that is required under this subdivision. *Page 107 
 (b) If under par. (a) 2 a decrease in benefit adjustment contributions under sub. (2m) would reduce the amount under sub. (2m) to less than zero, the employe contribution rates under sub. (1) shall be decreased.
It is my opinion that section 40.05(2n) controls and the ETFB is required to divide the contribution adjustment between employer and employe contributions. Correspondingly, the ETFB lacks the statutory authority to increase only the employer contribution under section 40.05(2)(a).
WEAC suggests that there is ambiguity in the phrase "for any annual period after 1989" and that it is unclear as to whether the period intended (to invoke the adjustment division between employer and employe contributions) is the period during which the error was made or the period during which the correction is made. While the correction was made in the 1991 contribution rates, the error occurred beginning with the December 31, 1985, valuation, prior to enactment of section 40.05(2n). I find nothing in the language of section 40.05 however that indicates that the Legislature intended mechanical mistake correction to be handled any different than actuarial mistakes. The whole purpose of section 40.05(2) is to adjust the contribution rate to ameliorate prior mistakes.
As stated by the actuary (Wisconsin Department of Employe Trust Funds 9th Annual Actuarial Valuation, December 31, 1989, at 37):
The principal areas of risk assumption are:
 (i) long-term rates of investment income likely to be generated by the assets of the retirement fund — this includes both realized and unrealized appreciation and depreciation
 (ii) rates of mortality among participants, retirants and beneficiaries
(iii) rates of withdrawal of active participant
(iv) rates of disability among participants *Page 108 
 (v) patterns of salary increases to be experienced by participants
 (vi) the age and service distribution of actual retirements.
 In making a valuation the actuary must project the monetary value of each risk assumption for each distinct experience group, for the next year and for each year over the next half-century or longer.
 Once actual risk experience has occurred and been observed, it will not coincide exactly with assumed risk experience, regardless of the skill of the actuary, the completeness of the data, and the precision of the calculations. Each valuation provides a complete recalculation of assumed future risk experience and takes into account all past differences between assumed and actual risk experience. The result is a continual series of small adjustments to the computed contribution rate.
The listed areas of risk assumption are subject not only to errors resulting from projection but also to mechanical errors in reporting and computation. The actuary indicates that actual risk experience "will not coincide exactly with assumed risk experience, regardless of the skill of the actuary, the completeness of the data and the precision of the calculations." This summary of risk analysis assumes the possibility of error both in projection and in generation of the data.
Similarly, the Joint Survey Committee on Retirement Systems Report on 1989 Senate Bill 148, which created section 40.05(2n), states at 3:
 This bill provides that any future changes in the contribution rates after 1990 shall be shared equally between employer and employe participants of the system.
The focus again is to the handling of changes required after 1990, not on the cause of the changes. This is in direct contrast to section 40.05(2n)(a)3. which requires that "[a]ny increase in *Page 109 
contribution rates required after 1989 that results from benefitimprovements under 1989 Wisconsin Act 13 . . . shall be provided for by an increase in benefit adjustment contributions under sub. (2m)." Since the Legislature has in subsection (2n)(a)3. specifically related the increase to the cause but has not done so in subsection (2n)(a), it is not appropriate to expand the (2n)(a) language to treat a change resulting from a pre-1989 error differently than a change resulting from an erroneous assumption. It is therefore my opinion that section 40.05(2n) applies to future changes to the contribution rates regardless of the type of error that necessitated the changes.
You also ask:
 Does the Board action to increase contribution rates to employes for 1991 impair an existing contractual right of employes as suggested in the WEAC memo dated December 5, 1990?
As discussed in my response to the previous question, section40.05(2n) requires that one-half of the contribution rate increase be assigned to employe contribution rates. It is my opinion that neither section 40.05(2n) nor its implementation by the ETFB impairs an existing contractual right of employes affected.
Article I, section 10, clause 1 of the United States Constitution states that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts . . . ." Similarly, article I, section 12 of the Wisconsin Constitution states that "[n]o bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed . . . ."
As the court stated in State ex rel. Cannon v. Moran, 111 Wis.2d 544,554, 331 N.W.2d 369 (1983), "[t]he first step in analyzing a contract clause problem is to determine whether an obligation of contract has been impaired." A contract is impaired when the rights and obligations of the parties to that contract, which arise by virtue of that contract, are altered by legislation. Home Building Loan Ass'n. v. Blaisdell, 290 U.S. 398,431 (1934). "The first step is to inquire whether the *Page 110 
challenged statute has `operated as a substantial impairment of a contractual relationship'" (case cites omitted). Chappy v. LIRC,136 Wis.2d 172, 187, 401 N.W.2d 568 (1987). "There is some indication that, where only a minimal alteration is present, `the inquiry ends as no constitutional violation has occurred'" (case cites omitted). Chappy, 136 Wis.2d at 188, n. 9.
Wisconsin common law holds that participants have no vested right to retirement benefits absent a specific statutory or contractual provision creating vested rights. State ex rel.McCarty v. Gantter, 240 Wis. 548, 555, 4 N.W.2d 153 (1942). Whatever rights are established contractually or by statute are determined as they exist at the time of retirement. State ex.rel. Smith v. Annuity Pension Board, 241 Wis. 625, 629,6 N.W.2d 676 (1942). State Teachers' Retirement Board v. Giessel,12 Wis.2d 5, 10, 106 N.W.2d 301 (1960), held that the contractual rights included the right to earnings (the teachers' retirement system was a money-purchase benefit system in 1960). Neither that case nor any later Wisconsin case negates the concept that the vested rights are fixed at retirement absent a statute giving greater or lesser rights.
Section 40.19(1) provides vesting of contractual rights during employment by stating that:
 Rights exercised and benefits accrued to an employe under this chapter for service rendered shall be due as a contractual right and shall not be abrogated by any subsequent legislative act. The right of the state to amend or repeal, by enactment of statutory changes, all or any part of this chapter at any time, however, is reserved by the state and there shall be no right to further accrual of benefits nor to future exercise of rights for service rendered after the effective date of any amendment or repeal deleting the statutory authorization for the benefits or rights. This section shall not be interpreted as preventing the state from requiring forfeiture of specific rights and *Page 111 
benefits as a condition for receiving subsequently enacted rights and benefits of equal or greater value to the participant.
I find no contractual violation resulting from the increased employe contribution rate of .01 percent of payroll since 1989 Wisconsin Act 13 provided rights and benefits which can be considered to be of equal or greater value. Assuming that the employe contribution as set by sections 40.05(1)(a)1. and (2m) IS a vested contractual right under section 40.19(1), the unreduced early retirement and reduction of exposure to unfavorable employe contribution increases set forth in 1989 Wisconsin Act 13 provide the quid pro quo required in the language of section 40.19(1).
The Pennsylvania cases cited by WEAC do not apply to our situation since the increased employe contribution the court was concerned with, had the sole effect of lowering the employer contribution with no offsetting advantage to the employes. SeeAss'n of Pa. State College v. State System, 505 Pa. 369,479 A.2d 962, 964-65 (1984), referred to in Pa. Federation of Teachers v.Sch. Dist., 506 Pa. 196, 484 A.2d 751, 753 (1984).
1989 Wisconsin Act 13, at sections 26 and 47(1), provides an "early retirement window" until June 30, 1990, and a general reduction in the amount of the early retirement penalty for those who retire after such date. These early retirement provisions thus provided a quid pro quo for any potential detriment to WRS participants since the Legislature required in the same act that future employer contribution increases be shared by both employers and employes.
A second potential benefit to WRS participants results from the actual legislated mechanics of the splitting of employer contribution increases between employer and employe contributions (1989 Wisconsin Act 13 at section 18). Potential benefit could result since section 40.05(2n) also provides for the crediting of one-half of any decrease in employer contribution rates to employe contributions. Additionally, section 40.05(2n) *Page 112 
requires that future increases in contribution rates are to be shared between employer and employe contributions, thus precluding the Legislature itself from increasing future employe contributions without providing offsetting increased benefits.
The "early retirement window" and reduction in early retirement penalty (after closure of the window on June 30, 1990) could, by itself, be held sufficient justification for any "forfeiture of specific rights and benefits." Section 40.19(1) states that "[t]his section shall not be interpreted as preventing the state from requiring forfeiture of specific rights and benefits as a condition for receiving subsequently enacted rights and benefitsof equal or greater value to the participant."
The Wisconsin courts have not interpreted the term, "participant," as used in section 40.19(1), in regard to whether the offsetting advantage is to be balanced against detriment to the group or to an individual employe. Courts of other states are divided on this question. See Singer v. City of Topeka,227 Kan. 356, 607 P.2d 467, 475 (1980) ("[R]easonableness of legislative changes is to be measured by the advantage or disadvantage to the affected employees as a group or groups . . . .") and Abbott v.City of Los Angeles, 50 Cal. 2d 438, 326 P.2d 484, 492 (1958) ("[I]t is by advantage or disadvantage to the individual employes whose already earned and vested pension rights are involved that the validity of attempted changes in those rights depends . . . ."). I have no facts or actuarial studies, before me, that indicate that any individual participant or group of participants is substantially disadvantaged when balancing the advantages against the disadvantages of 1989 Wisconsin Act 13. Without clear indication of a "substantial" alteration of contractual rights without an offsetting benefit, the presumption of constitutionality of legislative acts controls.
A party who challenges the constitutionality of an act carries a heavy burden of persuasion. Our cases make it clear that *Page 113 
"[i]t is not enough that respondent establish doubt as to the act's constitutionality nor is it sufficient that respondent establish the unconstitutionality of the act as a probability. Unconstitutionality of the act must be demonstrated beyond a reasonable doubt. Every presumption must be indulged to sustain the law if at all possible and, wherever doubt exists as to a legislative enactment's constitutionality, it must be resolved in favor of constitutionality." State ex rel. Hammermill Paper Co.v. La Plante, 58 Wis.2d 32, 46, 205 N.W.2d 784 (1973); County ofPortage v. Steinpreis, 104 Wis.2d 466, 478, 312 N.W.2d 731
(1981). We affirm our previous statement that:
 "If there is any reasonable basis upon which the legislation may constitutionally rest, the court must assume that the legislature had such fact in mind and passed the act pursuant thereto. The court cannot try the legislature and reverse its decision as to the facts. All facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court." State ex rel. Carnation Milk Products Co. v. Emery, 178 Wis. 147, 160, 189 N.W. 564 (1922); State v. Interstate Blood Bank, Inc., 65 Wis.2d 482, 489, 222 N.W.2d 912
(1974).
Treiber v. Knoll, 135 Wis.2d 58, 64-65, 398 N.W.2d 756 (1987). Absent any showing that the facts as found by the Legislature are not reasonable, it appears that there is no "substantial" alteration of contract rights not offset by "benefits of equal or greater value." I therefore find no contract clause violation by enactment of 1989 Wisconsin Act 13.
You also ask:
 Is there authority under Wisconsin law which would allow the Board to add the increased cost to the "unfunded accrued actuarial liability" (UAAL) provided for in *Page 114 
s. 40.05(2)(b) through (bw) as proposed by WEAC in its December 14 correspondence?
WEAC suggests that the shortfall resulting from the error in reporting of creditable service to the actuary could be remedied without an increase in the employe contribution rate by increasing the UAAL and amortizing it over a thirty-nine year period (WEAC presentation to ETFB on December 14, 1990 at 1). As you state in explanation of this question at page 3 of your January 7, 1991 letter:
 If permissible under the law, the use of the UAAL approach would almost certainly result in an increase in contribution rates but these increases would apply only to employers.
It is my opinion that the authority to adjust the UAAL and establish a new forty-year amortization period, utilized by the ETFB in setting calendar 1990 contribution rates, was a one-time grant of authority and once used could not again be used to reallocate liabilities. The ETFB thus had no statutory authority to adjust the UAAL in setting 1991 or later contribution rates.
The UAAL results from unfunded prior service liability of participating employers, the unfunded costs of system benefit increases (not fully paid for by the enacting legislation) and interest on both of these liabilities. Section 40.05(2)(b) provides:
 Contributions shall be made by each participating employer for unfunded prior service liability in a percentage of the earnings of each participating employe. A separate percentage rate shall be determined for the employe occupational categories under s. 40.23
(2m) as of the employer's effective date of participation. The rates shall be sufficient to amortize as a level percent of payroll over a period of 40 years from the later of that date or January 1, 1986, the unfunded prior service liability for the categories of employes of each employer determined under s. 40.05(2)(b), 1981 stats., increased to reflect any *Page 115 
creditable prior service granted on or after January 1, 1986, increased to reflect the effect of 1983 Wisconsin Act 141, increased at the end of each calendar year after January 1, 1986, by interest at the assumed rate on the unpaid balance at the end of the year and adjusted under par. (bw).
In addition, section 47(2) (nonstatutory provisions) of 1989 Wisconsin Act 13 provides:
 As of the last day of the first full month occurring after the effective date of this subsection, $500,000,000 shall be distributed from the transaction amortization account of the fixed retirement investment trust to the appropriate reserves of the fixed retirement investment trust in an amount equal to a percentage of the total distribution determined by dividing each reserve's balance on the prior January 1 by the total balance of the fixed retirement investment trust on the prior January 1. The resulting increase in the employer accumulation reserve shall, on recommendation of the actuary, be first applied to funding any liabilities created by this act, and the balance shall be equitably allocated among employers that were participating employers under the Wisconsin retirement system on December 31, 1985, based on each employer's share of the total covered payroll in 1985. The individual employer unfunded prior service liability amounts and rates may be adjusted, a new 40-year amortization period shall be established to reflect this distribution, and liabilities may be reallocated between current and prior service liabilities as recommended by the actuary to meet the objective of stabilizing future total contribution rates.
Nonstatutory section 47(2) thus authorized the ETFB to adjust the UAAL to fund any liabilities created by 1989 Wisconsin Act 13 remaining after crediting the indicated portion of the $500,000,000 distribution from the transaction amortization account to the employer accumulation reserve. Based on the general effective date of 1989 Wisconsin Act 13, May 16, 1989, *Page 116 
the actuary recommended and the ETFB utilized such a UAAL adjustment in setting the calendar 1990 rates. See Wisconsin Department of Employe Trust Funds 8th Annual Actuarial Valuation, December 31, 1988, at 23. The actuary was required to take UAAL adjustment into consideration in recommending the calendar 1990 contribution rate since such rates are "determined on the basis of the information available at the time the determinations are made." Sec. 40.05(2)(am), Stats. I find this action by the actuary and ETFB to be consistent with section 47(2) of Wisconsin Act 13.
This authority to adjust the UAAL and fund it over a "new 40-year amortization period" was a one-time authority. The Legislature did not intend that authority to be exercised thereafter when setting annual contribution rates. Such authority was included in 1989 Wisconsin Act 13 under the "nonstatutory provisions." As stated at page 144 of the Legislative Reference Bureau's Wisconsin Bill Drafting Manual 1989-90, section 12.01:
 (1) LAW OF CONTINUING APPLICATION. It is the policy of this state to incorporate law of continuing application into the statutes. . . .
 (2) TYPES OF NONSTATUTORY PROVISIONS. In general, the following types of provisions need not be incorporated into the statutes:
. . . .
 (k) A temporary transitional provision, not extending beyond July 1 of the even-numbered year of the legislature's next biennial session. . . .
 (l) A provision affecting the timing of a law's application or nonapplication, not extending beyond July 1 of the even-numbered year of the legislature's next biennial session.
 (m) Any other provision that is narrow in scope and intended to be temporary. *Page 117 
It appears that adjustment of the UAAL and establishment of a new forty-year amortization period was intended to be a transitional provision to be utilized by the actuary and ETFB in the next rate-setting period, 1990. Had the Legislature intended otherwise, such authority would have been incorporated in the statutory provisions.
WEAC's suggestion that the ETFB was granted the authority to adjust the UAAL in the determination of the 1991 contribution rates amortizing the .2 percent liability over a thirty-nine-year period appears contrary to the specific requirement of nonstatutory section 47(2) which requires amortization over "a new 40-year period." While the actuary did discuss the possibility of amortizing part of the 1991 rate increase over a thirty-nine-year period, this was not in the context of changing the UAAL nor was such amortization recommended.
The actuary, at page 5 of the September 14, 1990 Special Considerations in 1991 WRS Rate Development memorandum to the ETFB, discusses some "possibilities" for dealing with the increase in contribution rate resulting from the service credit error. Among these possibilities was "Amortization of Supplemental Liability" which is described as follows:
 Under statutory authority provided in s. 40.04(1), a supplemental liability account could be created with respect to the service adjustment and amortized over a 39 year period. The immediate effect would be to reduce the rate increase in the General division from 0.8% to 0.3%. The special amortization account would not necessarily have to be added to the present UAAL, but could be treated as a portion of the normal cost. In future years, if net gains occur, this account could be reduced or, hopefully, eliminated. This continues to be a possibility. It has the disadvantage of continuing to highlight a current data adjustment far into the future. *Page 118 
While this approach bears some similarity to the "Experience Amortization Reserve" already utilized in the contribution rate determination, we need not consider whether this "Amortization of Supplemental Liability" is a permitted method since it was not recommended by the actuary for adoption by the ETFB. See
Wisconsin Department of Employe Trust Funds 9th Annual Actuarial Valuation, December 31, 1989, at 42, for the actuary's explanation of the Experience Amortization Reserve.
Section 40.03(1)(e) empowers the ETFB to "approve the contribution rates and actuarial assumptions determined by the actuary under sub. (5)(b) . . . ." Subsection (5)(b) provides that the actuary shall "certify, as a result of each investigation, the actuarial assumptions to be used for computing employer contribution rates . . . ." Section 40.05(2)(am) provides that the employer current service contribution shall be determined "on the assumptions the actuary recommends and the board approves." Since the actuary has not recommended "amortization of supplemental liability" but recommended "the increased interest assumption . . . as the basis for completing the December 31, 1989 actuarial valuation," the ETFB lacks the basis to consider an "amortization of supplemental liability" method of valuation. See Special Considerations in 1991 WRS Rate Development, at 5, last sentence. The ETFB lacks the authority to adopt a method of actuarial valuation that is not recommended by the actuary.
JED:WMS *Page 119